511 F.2d 963
 7 ERC 1667, 5 Envtl. L. Rep. 20,213
 PEOPLE OF the STATE OF CALIFORNIA ex rel. STATE WATER
RESOURCES CONTROL BOARD, Petitioner,
v.
The ENVIRONMENTAL PROTECTION AGENCY, and Russell E. Train,
as Administrator of the Environmental Protection
Agency, Respondents.
STATE OF WASHINGTON and its Department of Ecology, Petitioners,
v.
The ENVIRONMENTAL PROTECTION AGENCY and Russell E. Train, as
Administrator of the Environmental Protection
Agency, United States of America, Respondents.
 Nos. 73--2466, 73--2486 and 74--1189.
 United States Court of Appeals,
Ninth Circuit.
 Feb. 13, 1975.
Certiorari Granted June 23, 1975.
See 95 S.Ct. 2655.
 
 Roderick Walston, Deputy Atty. Gen. (argued) San Francisco, Cal., Charles B. Roe, Jr., Deputy Atty. Gen. (argued), Olympia, Wash., for petitioners.
 Raymond W. Mushal (argued), Dept. of Justice, Washington, D.C., for respondents.
 OPINION
 Before WRIGHT and CHOY, Circuit Judges and BURNS,* District Judge.
 EUGENE A. WRIGHT, Circuit Judge:
 
 
 1
 Are federal agencies and enclaves within California and Washington required to comply with state procedural requirements with respect to control of water pollution? We hold that they are and we direct the respondent administrator to proceed accordingly and to reconsider the application of the state agencies of Washington and California.
 
 
 2
 Section 313 of the 1972 Amendments to the Federal Water Pollution Control Act (hereinafter 'the Act,' 33 U.S.C. §§ 1251--1376 (Supp. II, 1972)) directs that federal agencies 'shall comply with . . . State . . . requirements respecting control and abatement of pollution.' But the issue before us is whether federal agencies should submit to the precedural requirements for securing discharge permits which state regulatory bodies may impose on local dischargers under section 402 of the statute, which is also sometimes referred to as the Clean Water Act.
 
 
 3
 Section 402 of the Act (33 U.S.C. § 1342) established the National Pollutant Discharge Elimination System (hereinafter NPDES). Thereunder, the Administrator of the Environmental Protection Agency (hereinafter 'the Administrator') is delegated the initial responsibility for issuing permits for discharges of pollutants into the navigable waters[1] of the United States.
 
 
 4
 The Act contemplates, however, that the states will assume primary responsibility for operation of the NPDES permit system. Section 402(b) of the Act (33 U.S.C. § 1342(b)) provides for approval by the Administrator of state-submitted permit programs which are adequate to ensure compliance with the federal standards set out in the Act. After approving a state program, the Administrator is required to suspend his issuance of discharge permits 'as to those navigable waters subject to (that state's) program.' Section 402(c)(1) of the Act (33 U.S.C. § 1342(c)(1)).
 
 
 5
 Petitioners (California and Washington) challenged the Administrator's limited approval of their proposed permit programs in original actions authorized by Section 509(b)(1)(D) of the Act (33 U.S.C. § 1369(b)(1)(D)). Both states claim error because the Administrator's approval exempted federal agencies and instrumentalities from compliance with their proposed permit programs. We ordered the cases consolidated for purposes of the government's briefing and oral argument.
 
 
 6
 We have determined that the interpretation advanced by petitioners, that the Act provides for state regulation of federal as well as state dischargers, is correct. Hence we declare invalid those portions of 40 C.F.R. 125.2(b) that exclude federal facilities discharging pollutants into navigable waters from compliance with any state permit program operating under NPDES. We direct the Environmental Protection Agency and its Administrator to include henceforth in any otherwise approvable permit program submitted to it by the governors of the States of Washington or California, the authority to issue permits for all discharges by federal facilities within their respective jurisdictions.
 
 
 7
 A. THE STATUTE.
 
 
 8
 Modern federal legislation in the area of water pollution control began in 1948 with the enactment of the initial version of the Federal Water Pollution Control Act, ch. 758, 62 Stat. 1155. The Act was amended in 1956, 1965, 1966, and 1970 as well as in 1972, each set of amendments seeking to establish a more comprehensive and effective national system for encouraging and coordinating regulation of waste discharges into the nation's waters.
 
 
 9
 At the same time, all successive versions of the Federal Water Pollution Control Act have reflected a consistent federal policy that the primary responsibility and right to control water pollution lies with the states. See generally S.Rep.No.92--414, 1972 U.S.Code Cong. & Admin.News, pp. 3668, 3669--3670. As a corollary, the federal role has primarily been viewed as one of supporting and assisting state efforts in this area. See id. Section 21(a) of the 1970 amendments to the Act (collectively dubbed the Water Quality Improvement Act of 1970, Pub.L. 91--224, 84 Stat. 91) applied this policy of primary state responsibility for water pollution control to federal agency dischargers. It required federal agencies having jurisdiction over properties, or engaged in public works activities, to comply with 'applicable water quality standards' as well as with the more general pollution abating purposes behind the legislation.
 
 
 10
 In reporting favorably what became the House version of the 1970 amendments, the House Committee on Public Works noted that Section 21(a) would require federal agencies to take 'immediate and appropriate steps to insure compliance with applicable Federal, State and local water quality standards . . . subject to the availability of appropriations and the needs of the United States.' H.R.Rep.No.91--127, 1970 U.S.Code Cong. & Admin.News, pp. 2691, 2736--2737.
 
 
 11
 The final bill which emerged from conference removed any discretion based on availability of appropriations, and thus required compliance by federal agencies subject only to 'the paramount interest of the United States as determined by the President.' Id. at 2740. The interpretation of Section 21(a) suggested by this legislative history (that federal agencies must comply with local pollution abatement standards and guidelines 'unless and until the President may determine otherwise') was judicially approved in California v. Davidson, 3 E.R.C. 1157, 1158 (N.D.Cal.1971) (refusing to dismiss an action by the State of California against the Army's commanding general at Fort Ord, seeking injunctive relief and damages for the installation's violation of the state's waste discharge limitations).
 
 
 12
 Section 21(a) was replaced in 1972 by Section 313 of the 1972 Amendments, 33 U.S.C. § 1323, which set out the compliance requirement for federal agencies in the following language:
 
 
 13
 Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants shall comply with Federal, State, interstate, and local requirements respecting control and abatement of pollution to the same extent that any person is subject to such requirements, including the payment of reasonable service charges. The President may exempt any effluent source of any department, agency, or instrumentality in the executive branch from compliance with any such a requirement if he determines it to be in the paramount interest of the United States to do so; except that no exemption may be granted from the requirements of section 1316 or 1317 of this title. No such exemptions shall be granted due to lack of appropriation unless the President shall have specifically requested such appropriation as a part of the budgetary process and the Congress shall have failed to make available such requested appropriation.
 
 
 14
 The legislative history behind Section 313 shows that Congress considered that section 'similar to one in existing law.' S.Rep.No.92--414, 1972 U.S.Code Cong. & Admin.News, p. 3733. Several supplementary affidavits submitted by petitioner State of California indicate that some federal installations may in fact be refusing in certain instances to comply with water quality standards established by state administrative boards.[2] However, respondents are willing to concede, at least in principle, that Section 313 does command deference to the substantive effluent limitations and standards promulgated by states pursuant to the Act.
 
 
 15
 In determining whether Section 313 commands a like federal deference to procedures for obtaining state NPDES permits, California v. Davidson, supra, may again be of some guidance. In that case District Judge Weigel held that California's assertion that the Army had refused to bring one of its facilities into compliance with 'requirements' promulgated by a California regional water quality control board stated a good cause of action for injunctive relief under Section 21(a) of the 1970 amendments to the Act (the former 33 U.S.C. § 1171(a) (1970)). Since the regional boards determine 'substantive' requirements applicable to specific waste discharges via administrative hearings which are ordinarily participated in by the discharger,[3] the inference might be drawn that Section 21(a) required compliance with state administrative procedures as well.
 
 
 16
 Any such inference that federal agencies must comply with 'procedural' as well as substantive state discharge permit requirements could only be strengthened by the language of the section of the 1972 amendments which replaced Section 21(a), considered in Davidson. Section 21(a) had required only that federal agencies comply with 'applicable water quality standards,' without specifying whether compliance was limited to the substantive content of the 'standards' referred to, and without specifying whether those standards included state standards. Section 313 changed the word 'standards' to 'requirements,' and expressly made reference to 'State' and 'local' requirements.
 
 
 17
 B. CONDITIONS REQUIRED FOR A STATUTORY WAIVER OF EXCLUSIVE FEDERAL LEGISLATIVE JURISDICTION.
 
 
 18
 Standing by itself, however, this reasoning would be insufficient to allow us to conclude that the Act requires federal agencies to comply with procedures for obtaining permits under state programs satisfying the criteria of Section 402(b). Our ability to reach such a determination is limited by the plenary powers clause (U.S.Const. Art. I, sec. 8, cl. 17), which gives Congress exclusive legislative authority over federal enclaves. It is further limited by the supremacy clause (U.S.Const. Art. VI, cl. 2), according to which federal law cannot be subordinated to state regulation within the areas of Congress' exclusive legislative powers.
 
 
 19
 It is, of course, well established that Congress may waive exclusive legislative jurisdiction over the activities of federal enclaves in deference to state regulation of those activities, at least so long as in doing so it does not undermine its ultimate legislative control over these areas. Paul v. United States, 371 U.S. 245, 263, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963); United States v. Sharpnack, 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958). See also Mayo v. United States, 319 U.S. 441, 63 S.Ct. 1137, 87 L.Ed. 1504 (1943); Maun v. United States, 347 F.2d 970 (9th Cir. 1965).
 
 
 20
 But waivers of exclusive federal jurisdiction, like waivers of sovereign immunity, are to be strictly construed. Cf. Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). In order for us to hold in favor of petitioners, therefore, we must find that the claimed waiver of exclusive federal jurisdiction is clear and unambiguous, and also that it is not unduly broad or irrevocable.
 
 
 21
 C. THE SCOPE OF THE CLAIMED WAIVER.
 
 
 22
 Respondents point to the language of the plenary powers clause itself in arguing that Congress cannot delegate to states the authority to regulate federal facilities. On this point, however, we find persuasive the language in a recent case, Illinois v. Department of Defense, Civil No. 73 C 2081 (N.D.Ill., July 18, 1974) (unpublished memorandum filed with court by respondents):
 
 
 23
 The Plenary Powers Clause grants Congress the power '(t)o exercise exclusive Legislation . . . over all Places purchased by the Consent of the Legislature of the State in which the same shall be, for the Erection of Forts, Magazines, Arsenals, dockyards and other needful Buildings.' The defendants argue that the term 'exclusive' means literally that the States cannot be permitted to exercise any power in regard to these enclaves. In support thereof they cite three dictionary definitions of the meaning of the word, 'exclusive,' which is inappropriate. This reliance is ill founded, for while literal meanings may be helpful, they hardly measure the breadth or historical significance of the clauses of the Constitution.
 
 
 24
 Id., at 5.
 
 
 25
 A delegation to the states of permit-issuing authority over federal agencies would, to be sure, involve the states to a far greater extent in the regulatory process than would an incorporation of their evolving substantive standards into federal law (the type of legislation upheld in United States v. Sharpnack, supra). However, Paul, supra, 371 U.S. at 263, 83 S.Ct. 426, clearly indicates that states may engage in actual regulatory activities if allowed by specific Congressional action. This would seem a natural extension of the power of Congress to delegate substantive lawmaking authority as in Sharpnack. As the Supreme Court noted in Carlson v. Landon, 342 U.S. 524, 542, 72 S.Ct. 525, 535, 96 L.Ed. 547 (1952), 'Congress can only legislate so far as is reasonable and practicable, and must leave to executive officers the authority to accomplish its purpose.'
 
 
 26
 The Congressional purpose behind the Water Pollution Control Act is clear: 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.' (33 U.S.C. § 1251(a).) The strong state interest in controlling pollution has been recognized by the Supreme Court, see Illinois v. City of Milwaukee, 406 U.S. 91, 104, 107, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), as well as in the Act itself, see Section 101(b) of the Act (33 U.S.C. § 1251(b)).
 
 
 27
 Thus any delegation of permit-issuing responsibilities under the Act would merely involve 'the selection of an alternative means for achieving the purposes of the Act.' Illinois v. Department of Defense, supra, at 7. Since Congress has the power to subject federal agencies to substantive state standards, see United States v. Sharpnack, supra, we can see no reason why Congress cannot utilize state regulatory bodies to certify whether the affected agencies are in compliance with those standards.[4]
 
 
 28
 Several limitations embodied in the Act itself demonstrate Congress' efforts to ensure that the Act's grant of permitissuing authority to the states, under Section 402(b), could in no way undermine the federal government's ultimate power over its own instrumentalities and over interstate commerce by the constitutional grant of authority over these areas to Congress. First, the Act in no way seeks to limit Congress' ability to reassert exclusive control over the affected federal areas. Nor does it seem that in practice Congress would be politically compelled to retain the Act in its present form, if states attempted significant incursions into the federal prerogative.
 
 
 29
 Secondly, Section 402(b) allows the Administrator to withhold or withdraw approval of state programs which do not meet clearly defined guidelines set out in Section 402(a) of the Act.[5] Finally, as noted previously, Section 313 allows the President to exempt any effluent source from the provisions of the Act, where for any reason (other than a lack of appropriated funds) he deems it in the paramount national interest that a source not be covered. Section 313 of the Act (33 U.S.C. § 1323).
 
 
 30
 D. THE CLARITY OF THE WAIVER.
 
 
 31
 Having determined that Congress had the power to compel agencies within its 'exclusive' legislative jurisdiction to seek state discharge permits, we now consider whether it acted in a sufficiently unequivocal manner for us to conclude that it clearly intended to do so. See, e.g., United States v. King, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). We find the language of waiver sufficiently clear and free from ambiguity.
 
 
 32
 Both sides point to the Act's legislative history as supportive of their respective positions. However, it is admitted that that part of the record pertaining to Section 313 is silent as to the meaning of that section's 'shall comply with . . . State . . . requirements' admonition.
 
 
 33
 Nor do we find any other legislative history surrounding the Act which conclusively establishes whether Congress did or did not intend to distinguish between substantive and procedural requirements in defining the federal agency compliance duty with state permit programs. 'Confronted with this ambiguity, we rely on the words of (Section 313), the scheme of the Act as a whole, and what we discern to be the Congressional purpose, as the best guides to interpreting the section.' Alabama v. Seeber, 502 F.2d 1238, 1247 (5th Cir. 1974) (discussed infra).
 
 
 34
 If taken in isolation, certain parts of the legislative history would seem to indicate that the 'requirements' language of Section 313 refers simply and solely to substantive water quality standards. For example, the committee report accompanying the House version of the Act stated:
 
 
 35
 This section (Section 313) requires that Federal facilities meet the same effluent limitations, other limitations, performance standards, toxic effluent standards and thermal discharge regulations as private sources of pollution, unless the Federal facility is specifically exempted by the President.[6]
 
 
 36
 However, the last clause in the sentence containing the disputed 'requirements' language would seem to indicate that the above legislative history of Section 313 should be viewed as a mere summary of the Act's major provisions, and not taken as dispositive of Congressional intent.[7] That clause requires federal agencies to comply with state requirements respecting pollution control and abatement just as any other discharger, 'including the payment of reasonable service charges.'
 
 
 37
 Respondents contend that these 'reasonable service charges' refer to those for state and local sewage treatment hookups. We disagree. Although the legislative history of Section 313 is silent regarding the meaning of the 'reasonable service charges' language, it seems the better interpretation is to read it as referring to charges incident to state permit programs. Even if we were to read the word 'requirements' in Section 313 to mean 'effluent standards and limitations,' as respondents contend we should, interpreting the 'reasonable service charge' language to refer to municipal waste disposal charges would create a non sequitur.
 
 
 38
 Moreover, interpreting 'reasonable service charges' to refer to charges associated with state permit programs would be in accord with the canon of statutory construction that, where language in a statute can be given two possible interpretations, that interpretation should be chosen which does not render the language meaningless.[8] Although a state's taxing power cannot operate within the confines of a federal enclave without the consent of the United States, Mississippi River Fuel Corp. v. Cocreham, 390 F.2d 34, 35 (5th Cir. 1968), no serious contention has ever been made that subordinate governmental bodies must supply public utility services to federal agencies free of normal user charges. Hence, there would be no need for Congress to explicitly direct federal agencies to pay their full share of municipal sewer system costs. On the other hand, any permit program charges might be sufficiently in the nature of a tax that specific federal consent would be required before they could be certified as 'properly payable' federal obligations.
 
 
 39
 Reading 'reasonable service charges' to mean charges for administering state permit programs finds some support in past state administrative practices as well. Among the federal applicants for waste discharge 'requirements' from California's regional water quality control boards,[9] several have paid the filing fees required by state law.[10] (The State of Washington assesses no fee for processing discharge permit applications under the Act.) Congress may have been aware of this sporadic record of compliance, and have sought to ensure that in the future federal agencies would uniformly contribute their full share to the cost of processing their applications under state permit programs.
 
 
 40
 Section 313 also requires federal agencies to comply with state pollution control requirements 'to the same extent that any person is subject to such requirements.' Hence, the extent of the federal agency compliance duty can only be gauged from the type of program that section 402 of the Act demands that states institute for private dischargers.
 
 
 41
 Sections 402(a)(1) and 402(a)(2) of the Act (33 U.S.C. § 1342(a)(1) and (2)) sketch the type of state permit scheme contemplated by Congress. They provide for the imposition of 'conditions' on permits. Such conditions can realistically be expected to be developed only in the type of administrative proceeding in which the permit requirements can be tailored to the specific discharger.[11] Since this type of administrative proceeding requires cooperation by the discharger in order to be effective, an interpretation of Section 313, which did not compel federal agencies to comply with the procedural requirements of state permit programs would also jeopardize their conceded duty to comply with the substance of state water pollution control efforts.[12]
 
 
 42
 In other words, without federal agency participation in the regular state administrative process, it would be difficult to determine what substantive standards were properly applicable. Consequently, unless they are forced to seek discharge permits like any other dischargers, federal agencies will not be complying with state requirements--substantive or procedural--'to the same extent that any person is subject to such requirements,' thus undermining the purpose of Section 313.
 
 
 43
 We have already noted, however, the Administrator's apparent concession that federal agencies are bound by 'substantive' state requirements. It is therefore possible that his position is not that federal agencies may bypass state administrative processes, but only that after all effluent standards and limitations have been determined for a federal discharger, it is up to the Administrator and not the states to issue the permit incorporating these standards.[13]
 
 
 44
 This interpretation of Section 313's command should also be rejected. When we are faced with two alternative readings of an act, we should be reluctant to attribute to Congress a conscious choice in favor of the less efficient one,[14] at least when there is no constitutional compulsion to do so. This is especially the case, when we consider the admonition of Section 101(f) of the Act, 33 U.S.C. § 1251(f):
 
 
 45
 It is the national policy that to the maximum extent possible the procedures utilized for implementing this chapter shall encourage the drastic minimization of paperwork and interagency decision procedures, and the best use of available manpower and funds, so as to prevent needless duplication and unnecessary delays at all levels of government.
 
 
 46
 As with Section 402, Section 510 of the Water Pollution Control Act has no counterpart in the Clean Air language construed in Kentucky v. Ruckelshaus, 497 F.2d 1172 (6th Cir. 1974), and California v. Stastny, 4 E.R.C. 1447 (C.D.Cal.1972), appeal pending, 9th Circuit No. 72--2905. Section 510 provides:
 
 State authority
 
 47
 Except as expressly provided in this chapter, nothing in this chapter shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that if an effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance is in effect under this chapter; such State or political subdivision or interstate agency may not adopt or enforce any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance which is less stringent than the effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance under this chapter; or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.
 
 
 48
 The above language undercuts respondents' theory that 'effluent limitations' and 'requirements' were meant to be considered interchangeable terms within the framework of the Water Pollution Control Act. It specifically distinguishes between a 'standard' or 'limitation' respecting discharges of pollutants, in subdivision (1)(A), and a 'requirement respecting control or abatement of pollution' in (1)(B).
 
 
 49
 Moreover, Section 510 implicitly grants to states the right to develop more stringent standards than the Administrator might apply to a federal agency discharger. Thus, even if Section 313 were held to require federal agencies to seek permits from the Administrator rather than from the states, Section 510 would compel compliance with those state standards which were stricter than the Administrator's. But as noted above, Section 510 would in practice be rendered ineffectual by such an interpretation for state permit program compliance is essential both to establishment of discharge standards and to detection of discharge violations.
 
 
 50
 Considered in the light of Sections 402 and 510, other sections in the Act afford added support to petitioners' interpretation of the term 'requirements' in Section 313, though the significance of each would have been less certain apart from these two sections. For example, several provisions of the Act use the terms 'effluent limitations' and 'standards' in a very precise sense.[15] Other sections expressly exempt federal agencies from their requirements.[16] And one section, Section 404 of the Act (33 U.S.C. § 1344), sets up a separate permit program, run by the Secretary of the Army rather than by the states, for discharges of dredged or fill material into navigable waters. Consequently, it would appear that the reference in Section 313 to federal agency compliance with state 'requirements,' was purposeful and artistic, and was meant to refer to those requirements which state administrative agencies might adopt under their express Section 402 authorizations.
 
 
 51
 This view is supported by Section 505(f) of the Act (33 U.S.C. § 1365(f)), which also shows that the Act's drafters meant to draw a distinction between the two terms. Section 505(f) explicitly distinguishes between an 'effluent standard or limitation' and other types of 'limitation' or 'standard,' on the one hand, and a 'requirement applicable by reason of section 313' on the other.
 
 
 52
 It is true that other courts are in disagreement as to what effect should be given language in the Clean Air Act of 1970 (42 U.S.C. §§ 1857--1857l (1970)), portions of which are substantially identical to the language of Section 313 and of several other sections of the 1972 Water Pollution Control Act Amendments. Compare Alabama v. Seeber, supra, with Kentucky v. Ruckelshaus, 497 F.2d 1172 (6th Cir. 1974), and California v. Stastny, supra. At issue in those cases was whether Section 118 of the Clean Air Act (42 U.S.C. § 1857f), which lacks only the 'reasonable service charges' language of Section 313, requires federal agencies to seek state permits for air pollutant emissions.
 
 
 53
 In Seeber, the majority relied on Section 118 to hold unjustified the refusal of TVA and Army officials to apply for such permits. This was contrary to the prior holdings in California v. Stastny and Kentucky v. Ruckelshaus. In the Kentucky case, a unanimous Sixth Circuit panel had refused to order various TVA and other federal officials to seek state permits before operating air polluting equipment. The Kentucky court found 'no congressional intent to subject federal instrumentalities and agencies to state administrative regulations,' and concluded that:
 
 
 54
 In the absence of a clear congressional purpose to subject federal agencies to state regulation, the district court was prevented by the Supremacy Clause from granting the injunctive relief sought by the plaintiff.
 
 
 55
 Id. at 1176. In Stastny, the district court arrived at the same conclusion in a short memorandum decision.
 
 
 56
 We do not feel compelled to anticipate this court's ruling on the appeal in Stastny by adopting either the Fifth or the Sixth Circuit's position. We recognize the strong structural and terminological similarities between the Clean Air Act and the 1972 Water Pollution Control Act Amendments. Moreover, it seems likely that these similarities were intentional. Nevertheless, we feel that our conclusion--that Section 313 requires full federal agency compliance with state water pollutant discharge permit programs--would not be inconsistent with either an affirmance or a reversal of the district court's decision in Stastny.
 
 
 57
 As we have noted, the Water Pollution Control Act Amendments do contain significant provisions indicating a waiver of exclusive federal jurisdiction for which no counterparts are to be found in the Clean Air Act. The 'reasonable service charges' clause of Section 313, the permit program of Section 402, and Section 510, containing the Act's 'State Authority' provisions, are the most important examples of these.
 
 
 58
 Furthermore, although the language of Section 505(f), discussed supra, closely parallels that of Section 304(f) of the Clean Air Act,[17] there is also here critical additional language which seems to overcome the EPA's contention that Congress intended to incorporate a substantive-procedural distinction into the Section 313 compliance requirement. Section 505(f) (33 U.S.C. § 1365(f)) provides:
 
 
 59
 '(f) For purposes of this section, the term 'effluent standard or limitation under this chapter' means (1) effective July 1, 1973, an unlawful act under subsection (a) of section 1311 of this title; (2) an effluent limitation or other limitation under section 1311 or 1312 of this title; (3) standard of performance under section 1316 of this title; (4) prohibition, effluent standard or pretreatment standards under section 1317 of this title; (5) certification under section 1341 of this title; or (6) a permit or condition thereof issued under section 1342 of this title, which is in effect under this chapter (including a requirement applicable by reason of section 1323 of this title).'
 
 
 60
 The linking of the Section 402 permit scheme with the Section 313 'requirements' language in Subsection 505(f)(6) clearly indicates that state permit programs give rise to a separate category of requirements, non-compliance with which will subject federal agencies (and others) to suit under Section 505(a), just as 'substantive' noncompliance will. Consequently, the inclusion of Subsection 505(f)(6) in Section 505, the Act's primary enforcement section, dispels any ambiguity as to Congress' intention to require full compliance with the procedural requirements of state pollution control initiatives as well as with the substance of their programs.
 
 
 61
 This dual compliance requirement seems natural, when considered in light of Section 510, discussed supra, which sets out the broad powers allowed states under the Act to promulgate stricter regulations than those required by the federal government. Furthermore, as we have noted, the practical effect of reading Section 313 so as to compel only 'substantive' federal agency compliance would be to render state permit programs ineffectual as to those dischargers, both substantively and procedurally.
 
 
 62
 Finally, we find no bar to this action under the doctrine of sovereign immunity. Petitioner states proceeded in this action under Section 509(b)(1) (D). Since that section explicitly provides for challenges to the Administrator's 'determinations' regarding state programs, there can be no doubt as to Congress' consent to suits of the type before us.
 
 
 63
 Respondents assert that petitioners' remedy, if any, lay under the 'citizen suit' provisions of Section 505. We find this argument unpersuasive both as a matter of statutory construction and as a question of efficient judicial administration.
 
 
 64
 In the first place, we note that implicit in respondents' contention are the premises that petitioners are only concerned that federal agencies do in fact meet the substantive requirements of state permit programs, and that all the states are really seeking to accomplish in this case can be attained by case-by-case attacks on the occasional instances of substantive noncompliance. As we have already noted, however, the states have a significant interest in ensuring procedural as well as substantive compliance with their permit programs.
 
 
 65
 Moreover, assuming without deciding the additional premise of respondents that a state is technically a 'person' entitled to sue under Section 505, a state might nevertheless prefer to seek an advance determination of the scope of federal agency compliance duties under Section 509. What is challenged here is not a failure to perform any single 'act' or 'duty', as much as the Administrator's general misinterpretation of the scope of state regulatory jurisdiction under the Act. An action to spell out the scope of state authority granted by the Act seems to be the exact type of challenge that Congress must have contemplated in enacting Section 509. An interpretation that Congress intended that such a challenge be deferred until the states had first attacked individual violations of their programs would waste judicial resources as well as conflict with the Act's intent to let the states take the lead in attacking water pollution at the earliest possible time.
 
 
 66
 E. CONCLUSION.
 
 
 67
 In conclusion, the 1972 amendments to the Federal Water Pollution Control Act clearly mandate a federal agency duty of full compliance with all aspects of state permit programs. We are aware that the Act retains some phraseology which courts, in interpreting the Clean Air Act, have found too inconclusive to support the clear waiver of federal legislative jurisdiction which is necessary to overcome the presumption of exclusive federal jurisdiction under the plenary powers clause. But the 1972 version of the Water Pollution Control Act introduces several important terminological and structural changes from the Clean Air Act language. It also differs significantly from the Clean Air Act in the comprehensiveness of the administrative scheme it ordains. These distinctions help manifest the congressional purpose that states be in the vanguard of the national attack on water pollution,[18] as California v. Davidson, supra, found to have been the recurrent theme of federal water pollution control efforts. They also suggest a clear congressional choice to rely on state regulatory and enforcement agencies to carry out this effort.
 
 
 68
 Where a construction finding a waiver of exclusive federal jurisdiction would support the stated congressional purpose, then it seems to us that a purported waiver should be 'construed, if not liberally, at least sensibly.' See H. Hart and H. Wechsler, The Federal Courts and the Federal System 1351 (2d ed. 1973). In this case, Congress left no question as to its intent that states should take the lead in water pollution control efforts, and that states should view the compliance schedules and standards in Section 402(a) as floors, not ceilings, for their own Section 402(b) programs. Thus we act in accordance with the clear intent of Congress as well as with the plain language of the statute in holding that federal dischargers within a state's jurisdiction must comply fully with state permit programs satisfying the Section 402 conditions for approval by the Administrator.
 
 
 69
 We direct the Administrator to reconsider the applications of the States of Washington and California to the extent that he previously withheld approval from such proposed programs, and to act expeditiously on those previously disaproved portions of the applications in a manner not inconsistent with the views expressed in this opinion.
 
 
 
 *
 Of the District of Oregon
 
 
 [1]
 Congress has used the phrase 'navigable waters of the United States' in several different senses, ranging from the narrowest and most literal interpretation of that phrase ('navigable in fact') to the most expansive one permitted by the constitutional grant, U.S.Const. Art. I, sec. 8, cl. 3. Compare, e.g., The Daniel Ball, 77 U.S. (10 Wall.) 557, 19 L.Ed.2d 999 (1870) with Kalur v. Resor, 335 F.Supp. 1, 11 (D.C.D.C.1971). Cf. also Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). Section 502(7) of the Act (33 U.S.C. § 1362(7)) speaks of the term 'navigable waters' as encompassing 'the waters of the United States, including the territorial seas.' S.Conf.Rep.No.92--1236, 1972 U.S.Code Cong. & Admin.News, p. 3821. Thus Congress clearly meant to extend the Act's jurisdiction to the constitutional limit, to include all tributaries of rivers which, 'when combined with other waters or systems of transportation, . . . the commerce on such waters would have a substantial economic effect on interstate commerce.' Report of the Conference Committee on S. 2770, reported in A Legislative History of the Water Pollution Control Act Amendments of 1972, 166, 178 (Comm. on Publ. Works Print, 1973) (hereinafter cited as Legislative History)
 The Act thus contemplates regulation of any activity within the class of streams noted above or the class of pollution discharges into such streams, without regard to whether either the particular discharge or the individual receiving waters discernibly affect interstate commerce. See United States v. Ashland Oil & Transportation Co., 364 F.Supp. 349 (W.D.Ky.1973); United States v. Holland, 373 F.Supp. 665 (M.D.Fla.1974). The legislative history expressly discloses an intention to avoid the limitations on implementation of the 1965 Act which had been occasioned by a narrow interpretation of the phrase 'navigable waters' as used in that Act. S.Rep.No. 92--414, 1972 U.S.Code Cong. & Admin.News, p. 3742.
 
 
 [2]
 An affidavit of Bill Dendy, Executive Officer of the California State Water Resources Control Board, is attached to the reply brief of petitioner California. It details two recent occasions where the Administrator has issued permits for the discharge of pollutants by federal agencies (Norton Air Force Base and the U.S. Bureau of Reclamation) without including conditions in the permit as requested by the interested state regulator agencies. Instead, the Administrator is continuing to screen such state-requested permit conditions, and apply his own notions of 'best practicable' and 'best available' technology and of what constitutes compliance 'to the fullest extent possible' in issuing permits to federal agencies, rather than the standards suggested by the state. Cf. Section 301(b)(1) and (b)(2) of the Act, 33 U.S.C. § 1311(b)(1) & (b)(2). See also note 12, infra; S.Rep.No.92--414, supra note 1, at 3733:
 'Evidence received in hearings disclosed many incidents of flagrant violations of air and water pollution requirements by Federal facilities and activities. Lack of Federal leadership has been detrimental to the water pollution control effort.'
 
 
 [3]
 The Porter-Cologne Act, Cal. Water Code § 13020 et seq., enacted by the California legislature in 1969, authorizes California's regional water quality control boards to issue standards, or 'requirements,' applicable to waste discharges which might affect the state's waters. Id. § 13263. The regional boards conduct administrative proceedings, which are participated in by the applicant, and issue 'requirements' applicable to the specific discharge
 Both the regional boards and the State Water Resources Control Board, which must issue water appropriation permits, are required to comply with the provisions of the California Environmental Quality Act, Cal. Publ. Resources Code § 21000 et seq. The State Board is also statutorily required to consider 'the public interest.' Cal. Water Code §§ 1253, 1255, 1257.
 
 
 [4]
 Cf. Alabama v. Seeber, 502 F.2d 1238, 1248 (5th Cir. 1974)
 
 
 [5]
 However, the Administrator's role following approval of a state permit program is a very limited one. Sections 402(d)(2)(A) and (B) of the Act (33 U.S.C. § 1342(d)(2)(A) and (B)) allow the Administrator to prevent issuance of a state permit only if the proposed discharge would adversely affect a downstream state, or if the permit is inconsistent with the Administrator's guidelines under § 402(a)
 
 
 [6]
 H.Rep.No.92--911, Legislative History at 805. Similar language was found in the Senate committee reports accompanying S. 2770, eventually passed in lieu of the House bill. See S.Rep.No.92--414, supra note 1, at 3733--3734; S.Conf.Rep.No.92--1236, supra note 1, at 3812--3813
 
 
 [7]
 Accord, Comment, Local Control of Pollution from Federal Facilities, 11 San Diego L.Rev. 972, 991 (1974)
 
 
 [8]
 See J. Sutherland, Statutes and Statutory Construction § 46.06 (4th ed. C. Stands 1972)
 
 
 [9]
 See note 3, supra
 
 
 [10]
 See affidavit of Bill Dendy, cited in note 2
 
 
 [11]
 In programs modeled after the California NPDES program, the first to be approved by the Administrator following the Act's passage, the process is initiated by the discharger submitting a report of an actual or contemplated discharge to an administrative board. Thereafter the board conducts a hearing concerning the discharge, and develops limitations, requirements, and conditions with which the discharger must comply as a condition of obtaining and retaining the permit. It is thus by the administrative process that discharges are brought to the state's attention, and applicable quantitative and qualitative standards developed
 
 
 [12]
 We disagree with the assumption in Kentucky v. Ruckelshaus, 497 F.2d 1172, 1177 (6th Cir. 1974), that a permit has nothing to do with air (or water) quality. See Comment, supra note 7, at 986
 
 
 [13]
 This position would appear to be consistent with Executive Order No. 11752, 3 C.F.R. 380 (1974)
 Respondents' reliance on it is misplaced. In the first place, even if we accept respondents' contention that this executive order constitutes an administrative interpretation of Section 313, but see contra Alabama v. Seeber, 502 F.2d at 1249, the normal rule attaching significance to the manner in which a statute is interpreted by the agency charged with its enforcement is inapplicable here. That rule is based on the assumption that Congress' long-standing failure to overturn the agency's interpretation indicates congressional acquiescence in that interpretation. See Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). In this case, the executive order was issued too recently for Congress to have undertaken contrary amendatory action.
 Secondly, in finding support for its holding in Executive Order 11752, the court in Kentucky v. Ruckelshaus pointed out that the above-noted rule of statutory construction is of particular importance where supported by the legislative history of the act to which the order refers. 497 F.2d at 1176. Here, however, it is admitted that the legislative history is silent as to the question presented regarding the correct interpretation of Section 313.
 Finally, the fact that Executive Order No. 11752 was issued more than four months after petitioner California brought this suit suggests that the order was issued in response to it. For this reason also it is entitled to less weight.
 Nor can Executive Order No. 11752 be considered an exercise of the President's authority under Clean Air Act § 118 and § 313 of the Water Pollution Control Act to exempt federal facilities from certain requirements. 'Exercise of that authority contemplates a case by case determination that the exemption is 'in the paramount interest of the United States." Alabama v. Seeber, 502 F.2d at 1249.
 
 
 [14]
 Nowhere in the language of Section 402, establishing the NPDES, is there any suggestion that the Administrator may establish a dual permit system, administered in part by a state and in part by himself. The legislative history of Section 313 also is devoid of any indication that Congress intended to allow the Administrator to retain partial permit issuing authority
 
 
 [15]
 E.g., see Sections 301, 302, 303, 306, 307 and 315 of the Act (33 U.S.C. §§ 1311, 1312, 1313, 1316, 1317, 1325)
 
 
 [16]
 See Sections 306(c), 308(c), 401(a)(6) of the Act (33 U.S.C. §§ 1316(c), 1318(c), 1341(a)(6))
 
 
 [17]
 42 U.S.C. § 1857h--2(f)
 
 
 [18]
 See Section 101(b) of the Act (33 U.S.C. § 1251(b)). Cf. Alabama v. Seeber, 502 F.2d at 1244--45