The **UNITED STATES** of America,
Plaintiff,

v.

The **STATE OF CALIFORNIA** et al.,
Defendants.

Civ. No. S–3014.

United States District Court,
E. D. California.

Oct. 9, 1975.

John H. Germeraad, Douglas N. King, U. S. Dept. of Justice, Washington, D. C., Richard Nichols, Asst. U. S. Atty., Sacramento, Cal., for plaintiff.

Evelle J. Younger, State Atty. Gen., and Richard C. Jacobs, Roderick E. Walston, San Francisco, Cal., for defendants.

## OPINION

MacBRIDE, Chief Judge.

At the turn of the century, a burgeoning nation was in the midst of Western expansion. Hampering this expansion, however, was the simple geographical fact that great areas within the Western states and territories encompassed arid and semiarid lands. By the enactment of the Reclamation Act of 1902, Title 43 U.S.C. § 371 et seq., Congress concluded that much of these arid and semiarid lands could be made habitable and fruitful by the construction of federally-funded irrigation works.

Now, 73 years, dozens of projects, and billions of dollars later, this court is asked to enter "the delicate area of federal-state relations in the irrigation field,"[1] and resolve the question whether a state may impose terms and conditions on the federal government's acquisition of water for reclamation projects.

The United States initiated suit in this court on October 15, 1973, against the State of California, the State Water Resources Control Board, and its members. Jurisdiction was grounded under Title 28 U.S.C. § 1345, conferring original jurisdiction to the district courts over all civil actions, suits or proceedings commenced by the United States. The amended complaint of the United States seeks declaratory relief pursuant to Title 28 U.S.C. § 2201 as follows:

(1) Declaratory judgment that the United States can appropriate unappropriated water necessary for use in any federal reclamation project within the State of California, without the necessity of applying to the California State Water Resources Control Board;

(2) Declaratory judgment that when the United States chooses as a matter of comity to submit applications to the California State Water Resources Control Board, that Board must grant such applications if unappropriated waters are available;

(3) Declaratory judgment that when the United States chooses as a matter of comity to submit applications to the California State Water Resources Control Board, that Board cannot impose any terms or conditions in permits issued pursuant to such applications in contravention of federal law or which are not specifically authorized and required by federal laws, federal regulations, or federal administrative directives;

(4) Declaratory judgment that Decision 1422,[2] an April 4, 1973, decision of the California State Water Resources Control Board, is void in all respects where that decision conflicts with or contravenes federal law or requires action not specifically authorized and required by federal laws, federal regulations, or federal administrative directives.

---

1. Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958).

2. The conditions and terms imposed by Decision 1422 are specified hereafter in this opinion.

By its answer, California [3] raises the following legal issues in response:

(1) The United States is required to comply with all terms and conditions imposed by California on permits issued to the United States Bureau of Reclamation to appropriate water for reclamation purposes in California, pursuant to Section 8 of the Reclamation Act of 1902, 43 U.S.C. § 383, 32 Stat. 390; [4]

(2) The United States is required to comply with all terms and conditions imposed by California on permits issued to the United States Bureau of Reclamation to appropriate water for reclamation purposes in California, pursuant to recent environmental legislation passed by Congress, including the National Environmental Policy Act of 1969, 42 U.S.C. § 4321, 83 Stat. 852, and the National Environmental Quality Improvement Act of 1970, 42 U.S.C. § 4371, 84 Stat. 114;

(3) The United States, by accepting assignments for permit applications and by submitting its own permit applications, has agreed to comply with California law in appropriating water for reclamation purposes in California;

(4) The United States has accepted the benefits of the permits issued by California since 1938, and is thus estopped to deny the truthfulness of the statement that it must comply with all terms and conditions imposed by California's permits;

(5) The United States failed to file mandamus action or to seek judicial review in California of Decision 1422 in accordance with California law, and thus the doctrine of *res judicata* bars the United States from alleging the invalidity of Decision 1422.

On September 3, 1974, California moved for summary judgment pursuant to FRCP 56 and for judgment on the pleadings in accordance with FRCP 12(c). By these motions, California contends that there is no genuine dispute of any material fact and that the case is purely one of interpretation of federal and California law. The case is here now for disposition on these motions.[5] To fully understand the posture of this case and the nature of the questions presented herein, it is necessary to review its immediate history.

## HISTORY OF THE CASE

Following the enactment of the Reclamation Act of 1902, Congress from time to time has authorized specific reclamation projects by way of special reclamation acts. One such special project which was eventually authorized by Congress was the Central Valley Project [hereafter CVP] which envisioned the coordinated development of the Sac-

---

3. For the purposes of brevity and clarity, all defendants in this action shall be referred to as "California."

4. A detailed discussion of Section 8 of the Reclamation Act of 1902 will be made later in this opinion. Section 8 reads as follows: "Nothing in [this act] shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of such sections, shall proceed in conformity with such laws, and nothing in such sections shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof: Provided, that the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right."

5. By order of this court dated July 8, 1974, all action, except for discovery, in four companion cases was stayed pending a decision in the instant case. The stayed cases include: *Central Valley Eastside Project Association v. State Water Resources Control Board* (Civ S–2582); *Kern County Water Agency v. State Water Resources Control Board* (Civ S–2583); *San Joaquin County Flood Control and Water Conservation District v. State Water Resources Control Board* (Civ S–2730); and *State of California v. Morton* (Civ S–2924). All parties in these actions were given leave to file briefs in the instant case as *amici curiae*.

ramento and San Joaquin Rivers and their tributaries through a system of physical works to regulate and distribute water needed for agricultural, industrial, and municipal uses in the Central Valley of California. The CVP was authorized by the State of California through the Central Valley Project Act of 1933, Cal.Stats. Ch. 1042. California thereafter sought and secured federal assistance through the Rivers and Harbors Act of August 30, 1935, P.L. 74–409, 49 Stat. 1028, 1038; the Act of June 22, 1936, P.L. 74–739, 49 Stat. 1597; and the Rivers and Harbors Act of August 26, 1937, P.L. 75–392, 50 Stat. 844, 850. The Act of October 17, 1940, 54 Stat. 1198 provided in pertinent part as follows:

". . . that the entire Central Valley Project, California, . . ., is hereby reauthorized and declared to be for the purposes of improving navigation, regulating the flow of the San Joaquin River and the Sacramento River, controlling floods, providing for storage and for the delivery of the stored waters thereof, for construction under the provisions of the Federal reclamation laws of such distribution systems as the Secretary of the Interior deems necessary in connection with lands for which said stored waters are to be delivered, for the reclamation of arid and semiarid lands and lands of Indian reservations, and other beneficial uses, and for the generation and sale of electric energy as a means of financially aiding and assisting such undertakings and in order to permit the full utilization of the works constructed to accomplish the aforesaid purposes. . . ."

Construction of CVP was begun in 1937 and the initial units of CVP were placed into full coordinated operation in 1951. Speaking of the scope of the project, the Supreme Court of the United States noted in the case of *Ivanhoe Irrigation District v. McCracken*, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958):

"Central Valley is the largest single undertaking yet embarked upon under the federal reclamation program. It was born in the minds of far-seeing Californians in their endeavor to bring to that State's parched acres a water supply sufficiently permanent to transform them into veritable gardens for the benefit of mankind. Failing in its efforts to finance such a large undertaking, California almost a quarter of a century ago petitioned the United States to join in the enterprise. The Congress approved and adopted the project, pursuant to repeated requests of the State, and thus far has expended nearly a half billion dollars." 357 U.S. at 280, 78 S.Ct. at 1178.

Over the years, water uses increased in the Central Valley and Congress continued to authorize additional units and funds for CVP. One such unit, and the subject matter of the instant case, was the New Melones Project. The New Melones Project was originally authorized by the Flood Control Act of December 22, 1944, P.L. 78–534, 58 Stat. 887, and reauthorized by the Flood Control Act of October 23, 1962, P.L. 87–874, 76 Stat. 1180, 1191. The Flood Control Act of 1962 reads in part as follows:

". . . That upon completion of construction of the dam and powerplant by the Corps of Engineers, the project shall become an integral part of the Central Valley project and be operated and maintained by the Secretary of the Interior pursuant to the Federal reclamation laws . . . ."

The New Melones Project provides for a dam on the Stanislaus River, approximately 35 miles northeast of Modesto, California, to create a reservoir with a gross storage capacity of about 2,400,000 acre-feet,[6] for flood control, irrigation, municipal, industrial, domestic,

---

6. It is estimated that this storage capacity would create a lake stretching approximately 13 miles behind the dam.

power, recreation, water quality control, and fish and wildlife purposes. The New Melones Project provides also for the construction of a 300,000 kilowatt capacity hydro-electric powerplant immediately below the dam.

The United States, through the Bureau of Reclamation, Department of the Interior [hereafter the Bureau], had regularly applied to the California State Water Resources Control Board [hereafter the Board], and its predecessor, in accordance with California law, for permits authorizing appropriations of water. Similarly, the United States, through the Bureau, sought to obtain permits to appropriate unappropriated water from the Stanislaus River for development of the New Melones Project. To this end the Bureau filed with the Board applications Nos. 19303 and 19304, and sought assignments of applications Nos. 14858 and 14859.[7] The Board on April 4, 1973, rendered Decision 1422 which ruled on these applications. Although Decision 1422 granted the assignments and allowed permits to be issued for all the applications, it placed various terms and conditions on the permits. While California asserts that it has the authority to place terms and conditions on permits authorizing appropriations of water for reclamation projects, the United States counters that any imposition of terms and conditions by the state is impermissible.

## DECISION 1422.

As noted above, the Bureau applied to the Board for permits in the New Melones Project in accordance with four separate applications:

(1) Application 14858 was for a permit to appropriate 8,800 cubic feet per second [cfs] of water by direct diversion year round, and 980,000 acre feet per annum [afa] by storage to be collected from October 1 of each year to July 1 of the succeeding year for irrigation, domestic, municipal, industrial, fish culture, recreation, and water quality purposes from the Stanislaus River in Calaveras and Tuolumne Counties.

(2) Application 14859 was identical to Application 14858 except its purpose was to use the water for power generation purposes.

(3) Application 19303 was for a permit to appropriate 6,000 cfs by direct diversion and 2,400,000 afa by storage, both year round, for power generation from Stanislaus River in Calaveras and Tuolumne Counties.

(4) Application 19304 was for a permit to appropriate 2,250 cfs by direct diversion, and 2,400,000 afa by storage both year round, for irrigation, domestic, municipal, industrial, fish culture, recreation, and water quality control purposes from the Stanislaus River in Calaveras and Tuolumne Counties.

The primary point of diversion under all four applications is the proposed New Melones dam on the Stanislaus River, but there is also included a Knights Ferry division dam downstream from the New Melones dam.[8]

Numerous protests were filed in opposition to these applications by various individuals, companies, public agencies such as the Department of Fish and Game, and private associations such as the Environmental Defense Fund and the Sierra Club. These protests were concerned primarily with environmental matters or purported problems of diversion as related to prior users.

■ California law requires the Board to evaluate the specific intended use of each proposed project and find that it is reasonable, beneficial, and in

7. Applications Nos. 14858 and 14859 were originally filed in 1952 by the California Department of Finance. The Bureau sought assignment of these applications rather than file new ones so as to obtain a priority date of appropriation in accordance to California law.

8. The Knights Ferry dam is listed as a point of direct diversion under applications Nos. 14858 and 19304.

the public interest. The Board undertakes a balancing of competing demands and policy considerations and has broad discretion. Cal.Water Code § 1240; *Temescal Water Co. v. Department of Public Works*, 44 Cal.2d 90, 280 P.2d 1 (1955). As a preliminary matter, it should be noted that the Board concluded that sufficient unappropriated water was available to supply the Bureau's requests, other factors being equal.[9] Beyond this determination, the Board in Decision 1422 expressed several concerns:

(1) Perhaps of primary concern to the Board was the belief that the limited unappropriated resources of California should not be committed to an applicant in the absence of a showing of actual need for the water presently and within a reasonable time in the future. The Board noted:

"The lack of evidence that the New Melones Project water will be needed for consumptive use outside the four basic counties [Tuolumne, Calaveras, San Joaquin, Stanislaus] for many years to come, if ever, or that it will be used within those counties at any definite time in the future, raises substantial doubt whether permits should be issued to impound more water in the New Melones Reservoir, at least at this time, than is needed for satisfaction of prior rights and non-consumptive purposes—protection and enhancement of fish and wildlife, water quality, recreation, and the generation of power." Decision 1422 at page 17.

The Board noted that the Bureau had presented no specific plan for applying project water for consumptive purposes at any particular location. Further, the Board noted that CVP has substantial quantities of water that are not being used and are not under contract.

(2) The Board was further concerned that the reservoir which would be created by the New Melones dam would eliminate the use of the Stanislaus River for whitewater recreation and for stream fishing. The Board recognized that the reservoir would serve as a man-made lake for purposes of recreation and fishing, but did not consider this an equivalent substitute for the river's natural sources of recreation and fishing. The Board concluded:

"In view of the preponderance of the adverse consequences of maintaining a reservoir of the size proposed by the Bureau, the public interest requires that any permits issued pursuant to Applications 14858 and 19304 prohibit the impoundment of water in New Melones reservoir for consumptive purposes until further order of the Board following a showing that the benefit that will accrue from a specific proposed use will outweigh any damage that would result to fish, wildlife and recreation in the watershed above New Melones Dam and that the permittee has firm commitments to deliver water for such purposes." Decision 1422 at page 18.

(3) Another concern of the Board was the effect on the Stanislaus River salmon fishing resource—estimated to be worth $300,000 per year—by the granting of applications Nos. 14858 and 19304. Further study of this factor was felt to be necessary.

(4) The final major issue concerning the Board dealt with the question of granting the applications for the purpose of water storage. The question the Board posed to itself was whether the need for maintaining the river at its present regimen outweighed the need for additional power. Although the Board found that the annual benefits of the power function would be $5.5 million, it felt that the use of the river for recreation and environmental factors—especially whitewater uses and stream fishing—outweighed.

9. Decision 1422 at page 26.

In summary, the Board concluded:

"There is unappropriated water available to satisfy the demands of the project as proposed. However, the Bureau has no definite plan as to when or at what specific locations project water will be used for consumptive purposes outside the four basin counties, and it has sufficient surplus water from other sources to meet future increased demands outside these counties for a long period of years. Permits should not be issued for use of water outside these counties at this time.

The public interest requires that the use of the Stanislaus River for white-water boating, stream fishing and wildlife habitat be protected to the extent that water is not needed for other beneficial' uses. Therefore, although there is a demonstrated need for the full yield of the project for the four basin counties at some time in the future, but for which no contracts have been negotiated, and in view of the adverse effect the proposed reservoir will have upon these recreational uses, impoundment of water to satisfy that need should not be permitted at this time. Instead, the Board should retain jurisdiction over the permits for the purpose of approving incremental appropriations for consumptive use up to the quantities covered by the applications when the need for the water is substantial." Decision 1422 at pages 26–27.

The Board thereupon approved assignment of applications Nos. 14858 and 14859 to the Bureau, and approved these applications and applications Nos. 19303 and 19304, in part. Permits were issued subject to 25 separate terms and conditions. It would serve no useful purpose at this stage to delve extensively into the particulars and requirements of these 25 terms and conditions. However, a summary of these terms and conditions will be helpful to an understanding of the posture of this case:

(1) Conditions relating to impoundment—Conditions 1 and 2 defer full impoundment of all the waters sought by the Bureau until such time as the Bureau is able to demonstrate a plan or a firm commitment for the use of project water.

(2) Conditions relating to reservation of jurisdiction—Conditions 6, 9, 13, 20, and 22 reserve jurisdiction to the Board to impose further conditions on the Bureau to protect the "beneficial use" of water involved.

(3) Conditions relating to reporting requirements—Conditions 3, 7, 8, 12, and 21 impose requirements of further or continuing study or the filing of specified reports.

(4) Conditions limiting or controlling the use of water—Conditions 4, 5, 14, 19, 23, 24, and 25 place various limits or controls on the use of water to or from the project.

(5) Conditions relating to time—Conditions 10 and 11 impose various time constraints on completion of the project and application of water.

(6) Conditions relating to accessability—Conditions 15 and 16 discuss the access to be afforded to representatives of the Board and members of the public.

(7) Conditions imposing mandatory requirements—Condition 17 imposes the requirement on the Bureau to install an outlet pipe "as near as practicable to the bottom of the natural stream channel"; condition 18 requires the Bureau to clear vegetation and structures from the side of the reservoir in accordance with California Water Code provisions.

## QUESTIONS PRESENTED

Although the United States initiated this action in quest of declaratory relief, the legal issues presently before the court are framed by California's motions for summary judgment and judgment on the pleadings. To facilitate analysis, it is possible to consolidate under three general categories, the questions presented by California's motions:

(1) *Interpretation of federal law*— Does Section 8 of the Reclamation Act of 1902, 43 U.S.C. § 383, require federal

agencies, in appropriating water for reclamation purposes, to comply with state law? In this regard, California has asked the court to consider (a) the plain language and the Congressional history of the Reclamation Act of 1902; (b) the cases which have considered the Act; [10] (c) the analogies which might be drawn from other Acts of Congress enacted subsequent to the Reclamation Act of 1902; [11] (d) and the administrative practice of the Bureau of Reclamation.

(2) *Contentions in the nature of estoppel*—(a) Should the United States be equitably estopped to deny the validity of the Board's jurisdiction and of Decision 1422 because the United States initiated proceedings before the Board? (b) What is the *res judicata* and collateral estoppel effect of Decision 1422 as to the United States arising from the failure of the United States to appeal that decision pursuant to California law? (c) Should the court find that as a matter of law Decision 1422 does not materially alter or conflict with the purposes of the New Melones Project? (d) Would the failure to enforce Decision 1422 be contrary to the public policy of the people of California?

(3) *Procedural considerations*—Are the questions presented by this case appropriately determined and resolved by summary procedure?

## INTERPRETATION OF FEDERAL LAW

Both the United States and California have admitted to this court in oral argument that pursuant to the Supremacy Clause of the United States Constitution, U.S.Const. Art. VI cl. 2, and because of national implications inherent in reclamation of arid and semiarid lands, the Congress *could* afford all power and control over federal reclamation projects to the federal government, reserving no power or control for the states. See *Ivanhoe Irrigation District v. McCracken*, 357 U.S. 275, 294, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958). The United States has argued that Congress did just that when it enacted the Reclamation Act of 1902. By its reading of that Act, the United States contends that: (1) because all power and control over reclamation projects has been given to the federal government, it need not even apply to the states for permits to appropriate water for such projects, and (2) even if the federal government, because of comity, does apply to the states for permits to appropriate water, the states' sole function is to determine whether there exists sufficient unappropriated water for the project. California, on the other hand, has argued that the Congress, by way of the Reclamation Act of 1902 and other federal legislation, intended that the federal government should physically operate reclamation projects, but that the federal government must comply with state law in the appropriation of water for projects.[12] Thus, the essential dispute between the litigants here is not whether the Congress *could* preempt the field, but whether the Congress *has chosen* to do so.

---

10. The cases on which the parties primarily rely include: *Nebraska v. Wyoming*, 295 U.S. 40, 55 S.Ct. 568, 79 L.Ed. 1289 (1935); *California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 55 S.Ct. 725, 79 L.Ed. 1356 (1935); *Nebraska v. Wyoming*, 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945); *Ivanhoe Irrigation District v. McCracken*, 357 U.S. 466, 78 S.Ct. 1174, 2 L.Ed. 2d 1313 (1958); *Fresno v. California*, 372 U.S. 627, 83 S.Ct. 996, 10 L.Ed.2d 28 (1963); *Arizona v. California*, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963); *Ivanhoe Irrigation District v. All Parties*, 53 Cal.2d 692, 3 Cal.Rptr. 317, 350 P.2d 69 (1960).

11. Specific acts relied upon include the Federal Water Supply Act of 1958, 43 U.S.C. § 390b; the Auburn-Folsom South Project Act, 43

U.S.C. §§ 616aaa–616fff (1965); the National Environmental Policy Act of 1969, 42 U.S.C. § 4321; and the National Environmental Quality Improvement Act of 1970, 42 U.S.C. § 4371. In oral argument, California abandoned any reliance on the Federal Water Pollution Control Act, 33 U.S.C. § 1251 (1972).

12. Both in its briefing and in oral argument before this court, California has conceded that even under its view of the law, there would be two major limitations on the rights of states to impose terms and conditions on federal reclamation projects. These two limitations are: (1) the state cannot infringe on any specific grant of power to the federal government under federal law, and (2) the state can only control *un*appropriated water.

(1) The Reclamation Act of 1902.

At the very heart of this inquiry is the Reclamation Act of 1902 [hereafter the 1902 Act]. In 1902 the Western states and territories contained nearly one billion acres of land and comprised somewhat more than half of the United States' contiguous area. Great segments of this Western land, however, lay dry and fallow, either unnourished or undernourished by the nation's waterways. Over one-third of North and South Dakota were within the arid and semiarid belts. The portions of the States of Oregon and Washington lying west of the Cascade Mountain Range were within the humid climate, while portions lying east of the range, comprising approximately one-half of the territory of the two states, were arid or semiarid. In California arid and semiarid conditions existed over two-thirds of the state. Nearly one-third of Oklahoma was semiarid in character. Although neither Kansas nor Nebraska contained lands which were strictly speaking arid, nearly one-third of the western portion of each state was considered semiarid. The other states and territories of the West were wholly within the arid region, with the exception of limited areas affected by local conditions.[13]

As the United States grew in population, demand for productive land grew proportionately. It was estimated that through proper irrigation, between 35,-000,000 and 70,000,000 acres of land in the West could be reclaimed.[14] In 1900 the national platforms of the major political parties declared in favor of the undertaking by the federal government of the work of reclaiming arid and semiarid lands and holding such lands for settlers.[15]

President Theodore Roosevelt also favored development of the Western states and territories through irrigation and vigorously urged the enactment of legislation to this end:[16]

"It is as right for the National Government to make the streams and rivers of the arid region useful by engineering works for water storage as to make useful the rivers and harbors of the humid region by engineering works of another kind. The storing of the floods in reservoirs at the headwaters of our rivers is but an enlargement of our present policy of river control, under which levees are built on the lower reaches of the same streams.

The reclamation and settlement of the arid lands will enrich every portion of our country, just as the settlement of the Ohio and Mississippi valleys brought prosperity to the Atlantic States. The increased demand for manufactured articles will stimulate industrial production while wider home markets and the trade of Asia will consume the larger food supplies and effectually prevent Western competition with Eastern agriculture. Indeed the products of irrigation will be consumed chiefly in upbuilding local centers of mining and other industries which would otherwise not come into existence at all. Our people as a whole will profit, for successful home making is but another name for the upbuilding of the nation."

Before enacting the 1902 Act, Congress carefully considered the alternatives that either private enterprise or the states themselves develop reclamation projects, rather than the federal government. It was recognized that private enterprise had constructed various irrigation projects in the past, but it was also recognized that such private projects were of a relatively simple character, intended to supply only single farms

13. Report of the House Committee on Irrigation of Arid Lands, 57th Cong. 1st Sess. p. 1 (1902). Other states and territories included: Arizona, Colorado, Idaho, Montana, Nevada, New Mexico, Utah, and Wyoming.

14. Report of the House Committee on Irrigation of Arid Lands, 57th Cong. 1st Sess. p. 2 (1902).

15. *Id.* at pp. 4–5.

16. *Id.* at p. 5.

or limited areas of country.[17] As to the various states, the Congress considered lack of adequate funds for such extensive projects to be the most serious impediment.[18] Congressman Mondell, the leading advocate in the House for passage of the 1902 Act, suggested other reasons why the federal government, rather than the states, construct the reclamation projects: [19]

"It has been suggested that if private enterprise can not properly develop large irrigation systems the work might be undertaken by the respective States. There are many reasons why the States are not so well equipped to carry on this work as the Federal Government. In the first place, were the work carried on by the States, the disposition would be to utilize all of the waters flowing through a State within the State, provided there was no prior appropriation lower down on the stream, regardless of the most beneficial and economical development of the irrigation possibilities of the entire region. Further, the constitutions of some of the States forbid the undertaking of works of internal improvement; and even were the States the proper agency through which to carry on this development, none of the States in the arid region, are financially able to do so."

Nevertheless, the Congress was mindful that the individual states had substantial and legitimate interests in the appropriation, use, and distribution of water used for irrigation. There were interests represented in the Congress which favored strong States' rights and advocated legislation whereby the federal government would simply build the reclamation project works and then turn over to the states control of the waters. On the other hand, there were advocates of reclamation legislation which would be more limiting on the States' author-

ity, with power vested primarily in the federal government.

Section 8 of the 1902 Act as originally drafted and passed by the Senate was a strong States' rights provision: [20]

"Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation; *but State and Territorial laws shall govern and control in the appropriation, use and distribution of the waters rendered available by the works constructed under the provisions of this act:* Provided, That the right to the use of water acquired under the provisions of this act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right." [emphasis added].

The above-quoted provision was then amended in the House Committee on Irrigation of Arid Lands. It is the House amendment which was enacted into law and that amendment reads as follows: [21]

"Nothing in this act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use or distribution of water used in irrigation, *or any vested right acquired thereunder and the Secretary of the Interior, in carrying out the provisions of this act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any land owner, appropriator, or user of water in, to or from any interstate stream or the waters thereof:* Provided, That the right to the use of water acquired under the provisions of this act shall be appurtenant to the

---

17. *Id.* at pp. 2–3. House Debate on the Reclamation Act of 1902, 35 Cong.Rec. 6669 at 6675 (1902).

18. House Committee at pp. 3–4.

19. House Debate at p. 6676.

20. S. 3057, 57th Cong., 1st Sess., § 8 (1902).

21. House Committee at p. 20.

land irrigated, and the beneficial use shall be the basis, the measure, and the limit of the right." [emphasis added].

The change the House Committee made in the legislation apparently resulted from intervention by President Roosevelt, as noted by Representative Robinson of Indiana: [22]

"At the beginning of this session the arid-State members in committee assembled properly elected the gentleman from Nevada chairman and proceeded to draft an irrigation bill. The committee was composed of a large majority of Republicans, but politics was submerged to get some irrigation legislation. The committee, of course, was confronted with platforms and constitutions, national and State. Where they pointed their way, they adopted them; where they ran counter, they ran over them or passed them by.

They took up first the Republican national platform of 1900, and upon that this bill was drafted and introduced in the Senate. After a little while the bill passed without a division in the Senate, and went to the House Committee on Arid Lands, a majority of whose members are from arid or semi-arid States.

The troubles then began. The President was for one kind of irrigation, with national control of canals and water distribution, and the Republican platforms, national, State, and Territorial, and some State constitutions of States affected, were for another kind, with State control of canals and water distribution. The President told the committee that called on him that the Senate bill was not in consonance with his ideas of irrigation; that if the United States built canals it should, to keep the water supply from politicians, control the distribution."

This presidential intervention and its purpose was confirmed by President Roosevelt in his autobiography: [23]

"On the day the message was read, a committee of Western Senators and Congressmen was organized to prepare a Reclamation Bill in accordance with the recommendations. By far the most effective of the Senators in drafting and pushing the bill, which became known by his name, was Newlands. The draft of the bill was worked over by me and others at several conferences and revised in important particulars; my active interference was necessary to prevent it from being made unworkable by an undue insistence upon State Rights, in accordance with the efforts of Mr. Mondell and other Congressmen, who consistently fought for local and private interests as against the interests of the people as a whole."

Time and again during the Congressional debates, the supporters of the 1902 Act made clear the understanding that reclamation was a *national* project to be undertaken by the national government. To the suggestion that the federal government not itself reclaim the land in question but rather cede the land to the states, Congressman Reeder notes: [24]

"We have been told that the Government, which is the owner of these lands, should not reclaim them itself, but should cede them to the States. It is sufficient answer to that to say that many State grants have been already made of different amounts of land and for different purposes, and the experience of the past has demonstrated beyond any question that the States cannot be safely intrusted with the reclamation and settlement of these lands. No matter what conditions might be imposed on such a grant, schemers and speculators would find some way of manipulating the State legislatures and getting control

22. House Debate at p. 6670.

23. Theodore Roosevelt; An Autobiography, at p. 396 (Scribner 1926).

24. House Debate at p. 6740.

25. *Id.* at p. 6734.

of the lands in large tracts which would retard settlement."

And again Congressman Newlands notes as follows: [25]

"Nothing can be accomplished by conveying this land to the States. The State lines are arbitrary lines, not drawn with reference to the watersheds, but arbitrarily by the surveyors, straight north, south, east and west. Were these States so bounded that each could compose an entire watershed, with all of its tributaries, then it would be possible to cede all the public domain to the States with the expectation of some just and proper result, but a river, with all its tributaries, may reach into four or five States. Scientific reclamation requires conservation regardless of State lines."

However, by the inclusion of Section 8, Congress recognized that notwithstanding the national scope of reclamation, state law had important, albeit limited, functions in the equation. Certainly, Section 8 on its face does not make crystal clear the role of state law, although it is apparent that state law *does* have a role in regard to federal reclamation projects. By a careful reading of the Congressional history, however, it is apparent that state law would have at least two functions under Section 8 of the 1902 Act.

■ As to the first function, Congressman Martin indicated that Section 8 would be used to modify and complement Section 7, which latter section dealt with the federal government's power of eminent domain: [26]

"[Section 7] should be read in connection with section 8, which is in the nature of a limitation upon this section. Section 8 provides that the Secretary of the Interior, when proceeding under this act, must proceed in conformity with the State laws.

It therefore makes, taking the two sections together, simply an instruction to the Secretary of the Interior to invoke the aid of the State laws upon the subject of eminent domain where necessary."

Indeed, it was settled by the Supreme Court in *Ivanhoe Irrigation District v. McCracken*, 357 U.S. 466, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958) and in *Fresno v. California*, 372 U.S. 627, 83 S.Ct. 996, 10 L.Ed.2d 28 (1963), that Section 8 requires the federal government to look at state law to define the property interests for which compensation must be made pursuant to Section 7 eminent domain proceedings.

■ Secondly, Section 8 is a reaffirmation of the doctrine that the states are free to apply their own rules of water law and the federal government cannot enforce any particular rule upon any state. Section 8 was not written upon a clean slate, but rather, on the overlay of prior federal law. As examples of the federal legislation upon which Section 8 was based, Congressman Mondell cited the Act of July 26, 1866 (14 Stat. 253); the Act of July 9, 1870 (16 Stat. 218); and the Act of March 3, 1877 (19 Stat. 377). [27] In *California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 55 S.Ct. 725, 79 L.Ed. 1356 (1935), and cases cited therein, the Supreme Court noted as follows: [28]

"For many years prior to the passage of the Act of July 26, 1866 [citations omitted], the right to the use of water for mining and other beneficial purposes in California and the arid region generally was fixed and regulated by local rules and customs. The first appropriator of water for a beneficial use was uniformly recognized as having the better right to the extent of his actual use. The common law with respect to riparian rights was not considered applicable, or, if so, only

26. *Id.* at p. 6759.

27. *Id.* at p. 6679; other acts cited include the Act of March 3, 1891 (26 Stat. 1095)

and the Act of June 4, 1897 (30 Stat. 1136) [sic].

28. 295 U.S. at 154, 55 S.Ct. at 727.

to a limited degree. Water was carried by means of ditches and flumes great distances for consumption by those engaged in mining and agriculture. [citations omitted] The rule generally recognized throughout the states and territories of the arid region was the acquisition of water by prior appropriation for a beneficial use was entitled to protection; and the rule applied whether the water was diverted for manufacturing, irrigation, or mining purposes. The rule was evidenced not alone by legislation and judicial decision, but by local and customary law and usage as well. [citations omitted].

This general policy was approved by the silent acquiescence of the federal government, until it received formal confirmation at the hands of Congress by the Act of 1866. [citations omitted]"

The Supreme Court further explained that the Act of July 9, 1870, which amended the Act of 1866, was a reaffirmation of the doctrine that the states are free to apply their own rules of water law.[29] See also *Kansas v. Colorado*, 206 U.S. 46, 94, 27 S.Ct. 655, 51 L.Ed. 956 (1907).

Finally, the Supreme Court notes that the Desert Land Act of March 3, 1877, is fully consistent with this doctrine:[30]

"The Desert Land Act does not bind or purport to bind the states to any policy. It simply recognizes and gives sanction, in so far as the United States and its future grantees are concerned, to the state and local doctrine of appropriation, and seeks to remove what might be an impediment to its full and successful operation."

■ Similarly, Section 8 does not bind or purport to bind the states to any policy, but recognizes and gives sanction, as far as the United States and its grantees are concerned, to the state law doctrine of appropriative rights to water. In this regard, also, Section 8 guards prior rights granted by the individual states to individual water users.

As noted by Congressman Mondell in his committee's report to the House:[31]

"The American irrigator, beginning with the handicap of a woeful lack of knowledge of the subject, and an inherited common-law rule fatal to its solution, has acquired a vast fund of theoretic knowledge and practical experience. He has been instrumental in the adoption of rules and regulations, and the establishment of customs, relative to the use of water in irrigation to the arid region which, in some States, are well-nigh perfect, and in all are a distinct advance over former conditions. The bill recognizes the control of these local laws in matters of recording appropriations of water and in establishing and maintaining rights of users. . . ."

California, however, discerns another meaning within the words of Section 8. In short, California reads Section 8 as requiring the federal government to apply to affected states for permits to appropriate water for reclamation projects and to comply with terms and conditions which the affected states might impose (as long as not expressly prohibited by other federal law), before the federal government can acquire the water necessary to construct the project.

As an initial matter, it is at least arguable whether the United States, in acquiring water for the development of a reclamation project, should be considered an "appropriator" in the true legal sense of that term. Appropriation of a water right implies legal title thereto, and as the Supreme Court noted in *Ickes v. Fox*, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525 (1937):[32]

"Although the [federal] government diverted, stored, and distributed the water, the contention of petitioner that thereby ownership of the water or

---

29. *Id.* at p. 155, 55 S.Ct. 725.

30. *Id.* 295 U.S. at p. 164, 55 S.Ct. at 731.

31. House Committee at p. 8.

32. 300 U.S. at pp. 94–95, 57 S.Ct. at pp. 416–417.

water rights became vested in the United States is not well founded. Appropriation was made not for the use of the government, but, under the Reclamation Act [of 1902], for the use of the landowners."

Perhaps for clarity, it would be better to consider the federal government's actions in obtaining water for the development of reclamation projects as the "acquisition" rather than the "appropriation" of water.

However, even if the federal government is considered to be "appropriating" the water required to develop and operate the reclamation project, it is certainly not clear from the language of Section 8 nor from the Congressional history that the federal government must apply to states for permits to appropriate or that the federal government must comply with terms and conditions which states might impose on such permits.

If anything, the Congressional history of Section 8 indicates the opposite interpretation: that reclamation is an undertaking of national concern, transcending the often arbitrary geographic boundaries of individual states and territories. Even a leading States' rights advocate such as Senator Clark recognized the necessity of broad federal power in the development and construction of reclamation projects: [33]

"The question of the conversation of waters is one of national importance; the question of reservoir sites and reservoir building is one that appeals to the [federal] Government as a matter of national import, but the question of State or Territorial control of waters after having been released from their bondage in the reservoirs which have been provided is a separate and distinct proposition . . . . It is right that the General Government should control, should conserve, and should reservoir the headwaters of these streams. In this it is a na-

tional and not a State proposition. But in the distribution of these waters . . . it is right and proper that the various States and Territories should control in the distribution."

Of course, Senator Clark's suggestions as to the power of the *States* in controlling distribution were rejected by the House and ultimately, by Congress as a whole. Nevertheless, his comments are relevant and useful on the question of *federal* power regarding the development and construction of reclamation works.

The only comment within the Congressional history of the 1902 Act which might be supportive of California's position is a statement by Congressman Mondell in response to a question seeking clarification of the federal-state relationship envisioned by the 1902 Act. Congressman Mondell noted that it was necessary for the federal government, after determining the need and feasibility for a particular reclamation project, to refer to the affected state by "giving the notice and complying with the forms of law of the State . . . in which the works [are to be] located." [34]

On the one hand, this statement by Congressman Mondell supports California's position that the federal government must apply to affected states before acquiring the water necessary to construct a reclamation project. On the other hand, however, this statement might also be read, as the United States has done, to require compliance with the forms, but not necessarily with the substance of state law.

█ Indeed, while the Congressional history of the 1902 Act indicates broad federal purpose and authority in the operation and control of federal reclamation projects, the comity inherent in a federal system would not permit an overbroad usurpation of state sovereignty. Accordingly, the federal government is required, when acquiring water for federal reclamation projects, to com-

33. Senate Debate on the Reclamation Act of 1902, 35 Cong.Rec. p. 2222.

34. House Debate at p. 6678.

ply with the forms of state law, including application to state water boards where necessary, for two purposes: (1) to enable the state to determine, according to its law, whether there is sufficient unappropriated water available for the project; and (2) to give notice to the state of the scope of the project.

(2) Judicial Interpretation of the Reclamation Act of 1902.

Both the United States and California rely on several judicial decisions relating to the 1902 Act. It is necessary to review these cases to determine if they provide any insight on the question presented by the instant case.

(a) *Nebraska v. Wyoming*, 295 U.S. 40, 55 S.Ct. 568, 79 L.Ed. 1289 (1934) was a suit by Nebraska against the State of Wyoming for equitable apportionment of the waters of the North Platte River. The United States was not made a party to that suit and Wyoming, as part of its motion to dismiss, asserted that the United States was an indispensable party. In deciding that the United States was not an indispensable party, the Supreme Court stated: [35]

> "The bill alleges, and we know as a matter of law [citing Section 8 of 1902 Act], that the Secretary and his agents, acting by authority of the Reclamation Act and supplementary legislation, must obtain permits and priorities for the use of water from the state of Wyoming in the same manner as a private appropriator or an irrigation district formed under the state law. His rights can rise no higher than those of Wyoming, and an adjudication of the defendant's rights will necessarily bind him. Wyoming will stand in judgment for him as for any other appropriator in that state. He is not a necessary party."

Additionally, there is dicta in this opinion which is certainly supportive of

the position California advances to this court: the Supreme Court notes that the Secretary of the Interior had applied to the state engineer of Wyoming for permission to construct reservoirs and impound water "pursuant to the [1902] act," and also that the acts of the federal government in operating reservoirs are subject to the law of Wyoming.[36]

This dicta should not be afforded great weight, however, since the actions of the Supreme Court in 1935 should be considered procedural only. In 1938, the Supreme Court allowed the United States to intervene, over the objections of all the state parties, and stated that its order "shall be without prejudice to the determination on final decree of any of the substantive questions of law or fact advanced or to be advanced by any of the parties herein." [37]

(b) *Nebraska v. Wyoming*, 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945) was both a continuation and an extension of the 1935 case. At this time, however, the United States asserted that it owned all of the unappropriated water in the North Platte River at the time it acquired water rights for two federal reclamation projects, the North Platte Project and the Kendrick Project. The Supreme Court did not reach the question whether the United States did, in fact, own all the unappropriated water in the North Platte River because it determined that the United States' acquisition of water rights for the North Platte Project and the Kendrick Project "have been obtain in compliance with state law." [38]

In fact, the United States had made filings with the state: [39]

> "Initiation of both projects [North Platte Project and the Kendrick Project] was accompanied by filings made pursuant to § 8 [of the 1902 Act] in the name of the Secretary of the In-

---

35. 295 U.S. at 43, 55 S.Ct. at 569.

36. 295 U.S. at 42, 55 S.Ct. 568.

37. *Nebraska v. Wyoming*, 304 U.S. 545, 546, 58 S.Ct. 1035, 82 L.Ed. 1519 (1938).

38. 325 U.S. at 612, 65 S.Ct. at 1348.

39. 325 U.S. at 613, 65 S.Ct. at 1348.

terior for and on behalf of the United States. Those filings were accepted by the state officials as adequate under state law. They established the priority dates for the projects. There were also applications to the States for permits to construct canals and ditches. They described the land to be served. The orders granting the applications fixed the time for completion of the canal, for application of the water to the land, and for proof of appropriation. Individual water users contracted with the United States for the use of project water. These contracts were later assumed by the irrigation districts. Irrigation districts submitted proof of beneficial use to the state authorities on behalf of the project water users. The state authorities accepted the proof and issued decrees and certificates in favor of the individual water users. The certificates named as appropriators the individual landowners. They designated the number of acres included, the use for which the appropriation was made, the amount of the appropriation, and the priority date. The contracts between the United States and the irrigation districts provided that after the stored water was released from the reservoir it was under the control of the appropriate state officials."

Although the United States did submit the appropriate forms of law to the affected states and thereby gave notice of the construction of the reclamation projects, and also complied with the state law requirements in the construction of canals and ditches carrying water from the projects to users, the Supreme Court was careful to point out an important caveat: [40]

"Nor, as we shall see, is it important to the decree to be entered in this case that there may be unappropriated water to which the United States may in the future assert rights through the machinery of state law *or otherwise.*" [emphasis added]

And again the Court noted as follows: [41] "We intimate no opinion whether a different procedure might have been followed so as to appropriate and reserve to the United States all of these water rights. No such attempt was made."

On the one hand, these quotations may only be a reference to the power of eminent domain which the United States might have exercised pursuant to Section 7 of the 1902 Act. Viewed broadly, however, the quotations indicate a recognition that in the particular case before the court the United States *had* followed state law, but that opinion is reserved whether, under the circumstances of that case, the United States was *required* to do so under the 1902 Act.

And finally, the Supreme Court noted the narrow issues decided by the case, and indicated that its decision "in no wise interferes with the ownership and operation by the United States of its storage and power plants, works, and facilities." [42]

(c) *Ivanhoe Irrigation District v. McCracken,* 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958) is not particularly helpful to either the United States or California in the disposition of the instant case. In *Ivanhoe* the United States Supreme Court reversed several decisions of the California Supreme Court which had refused to confirm certain contracts entered into between two state irrigation districts and a water agency on the one hand, and the United States on the other. The California Supreme Court had held that the language of Section 8 requiring compliance with state law overrode the

---

40. 325 U.S. at 612, 65 S.Ct. at 1348.

41. 325 U.S. at 615, 65 S.Ct. at 1349.
   The following language from the *Nebraska* opinion is also noteworthy: .
   "We do not suggest that where Congress has provided a system of regulation for Federal projects it must give way before an inconsistent state system." 325 U.S. at 615, 65 S.Ct. at 1349.

This admonition was later borne out in *Ivanhoe Irrigation District v. McCracken,* 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958), discussed infra.

42. 325 U.S. at 616, 65 S.Ct. at 1349.

requirements of Section 5, which provides generally that no project water should be sold for use on land parcels exceeding 160 acres in size. The California court found that Section 5 of the federal law would be contrary to California law because it would result in discrimination against owners of parcels exceeding 160 acres. This decision led the court to refuse to confirm the aforementioned contracts. The United States Supreme Court in reversing the California Court, stated as follows: [43]

"As we read § 8, it merely required the United States to comply with state law when, in the operation of a reclamation project, it becomes necessary for it to acquire water rights or vested interests therein. But the acquisition of water rights must not be confused with the operation of federal projects. . . . We read nothing in § 8 that compels the United States to deliver water on conditions imposed by the State. . . ."

The California Supreme Court on remand in *Ivanhoe Irrigation District v. All Parties,* 53 Cal.2d 692, 3 Cal.Rptr. 317, 350 P.2d 69 (1960), recognized the scope of federal power in operating reclamation projects when it noted: [44]

"[The United States Supreme Court] expressly held that the United States may acquire, by condemnation if necessary, whatever water rights it may need to operate the project, so that after such acquisition such rights are not subject to state control."

However, this court feels that the true impact of the United States Supreme Court's decision in *Ivanhoe* as it relates to this case is not so much what the court said, but rather, what the court did not say. While recognizing that Section 8 did not require the United States to violate Section 5 merely because state law was not consistent with the requirements of Section 5, the United States Supreme Court expressly noted that its decision should not be read as "passing generally on the coverage of § 8 in the delicate area of federal-state relations in the irrigation field." [45]

(d) *City of Fresno v. California,* 372 U.S. 627, 83 S.Ct. 996, 10 L.Ed.2d 28 (1963) is not particularly relevant to the inquiry in this case, although it is cited by both parties herein. *Fresno* merely stands for the proposition that while Section 8 of the 1902 Act requires compliance with California law when defining the property interests, if any, for which compensation must be made pursuant to the Section 7 eminent domain power, Section 8 cannot operate to prevent the United States from exercising the power of eminent domain.

(e) *Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963), while primarily concerned with the construction of Section 14 of the Boulder Canyon Project Act,[46] necessarily interpreted the applicability of Section 8 of the 1902 Act, since, under Section 14 of the Boulder Canyon Project Act, the reclamation law shall govern the management of the works, except as otherwise provided.

The Boulder Canyon Project Act established a reclamation project on the Colorado River. Notwithstanding the federal government's construction, ownership, operation, and maintenance of the Colorado River works and the broad power given by Congress to the Secretary of the Interior to make contracts for the distribution of water, it was argued that Sections 14 and 18 of the Boulder Canyon Project Act took away virtually all of the Secretary's power by permitting the States to determine with whom and on what terms the Secretary would make water contracts. The Supreme Court disagreed with this argument.

Section 18 of the Boulder Canyon Project Act states:

43. 357 U.S. at 292, 78 S.Ct. at 1183.

44. 53 Cal.2d at 715, 3 Cal.Rptr. at 330, 350 P.2d at 82.

45. 357 U.S. at 292, 78 S.Ct. at 1184.

46. 45 Stat. 1057, 43 U.S.C. §§ 617–617t (1928).

"Nothing herein shall be construed as interfering with such rights as the States [now have] either to the waters within their borders or to adopt such policies and enact such laws as they may deem necessary with respect to the appropriation, control, and use of waters within their borders."

The Supreme Court noted as follows:[47]

"Section 14 provides that the reclamation law, to which the Act is made a supplement, shall govern the management of the works except as otherwise provided, and § 8 of the Reclamation Act [of 1902], much like § 18 of the Project Act, provides that it is not to be construed as affecting or interfering with state laws 'relating to the control, appropriation, use, or distribution of water used in irrigation.' In our view, nothing in any of these provision affects our decision, stated earlier, that it is the Act and the Secretary's contracts, not the law of prior appropriation, that control the apportionment of water among the States. Moreover . . . we hold that the Secretary in choosing between users within each State and in settling the terms of his contracts is not bound by these sections to follow state law.

The argument that § 8 of the Reclamation Act requires the United States in the delivery of water to follow priorities laid down by state law has already been disposed of by his court in [Ivanhoe and Fresno] . . . . Since § 8 of the Reclamation Act did not subject the Secretary to state law in disposing of water in [Ivanhoe], we cannot, consistently with Ivanhoe, hold that the Secretary must be bound by state law in disposing of water under the Project Act."

California has argued, however, that the Boulder Canyon Project differs significantly from the New Melones Project in that the former is an interstate development, whereas the latter is "wholly intra-state." This contention ignores the fact that reclamation projects, as a whole, are of national importance, transcending state lines. And this is so even where the project works are located solely within the geographical confines of a single state. Crops raised by project water in California, for example, may feed families in Maine, or create processing jobs in Illinois. In *Arizona* it was clear that the federal government, as operator of the Boulder Canyon Project, could not be subject to the varying and possibly inconsistent commands of different state legislatures in the disposal of water *from* the project. That holding, of course, does not directly answer the question posed by the instant case: whether the federal government must submit to state law in *acquiring* the water for the project.

In summary, it must be said that the cases cited and relied upon by both the United States and by California are more supportive of the position advanced by the United States, than of the position of California.

(3) Other federal legislation.

By analogy to acts of Congress passed into law subsequent to the 1902 Act, California contends that Congress has consistently intended to afford to the states the primary responsibility over "water distribution," and that the role of the federal government is to cooperate and participate with the states. in

47. 373 U.S. at 585–587, 83 S.Ct. at 1490–1491. The partial dissenting opinion of Mr. Justice Harlan is helpful in focusing on the narrowness of the Supreme Court's determination in *Ivanhoe.* Justice Harlan notes:

"[Ivanhoe], despite its dictum that § 8 applies only to the acquisition of rights by the United States and not to the operation of a dam, holds only that the clear command of § 5 of the [1902 Act]—that water deliveries to each user not exceed the quantity required for 160 acres—prevails over state law, not that state law does not generally govern priorities in the use of water from federal reclamation projects under § 8." 373 U.S. at 623–624, 83 S.Ct. at 1510.

reclamation projects. As an initial matter, it must be reiterated that the issue in this case does not revolve around "water distribution," but rather, "water acquisition." A thorough reading of the enactments cited by California does not, however, evince a Congressional abdication of the federal government's role in developing, operating, and controlling, federal reclamation projects.

■ (a) California contends that the policy declaration within the Federal Water Supply Act of 1958, 43 U.S.C. § 390b, is a reaffirmation of the primary responsibility of the states over "water distribution." That section reads as follows:

> "It is declared to be the policy of the Congress to recognize the primary responsibilities of the States and local interests in developing water supplies for domestic, municipal, industrial, and other purposes and that the Federal Government should participate and cooperate with State and local interests in developing such water supplies in connection with the construction, maintenance, and operation of Federal navigation, flood control, irrigation, or multiple purpose projects."

Certainly, this section is a recognition of the individaul states' primary obligations to develop water supplies for internal uses. On this basis the federal government is charged with participation and cooperation with the states in the development of such water supplies. It would be too broad a reading of this section to infer that the federal government is thereby subjected to individual state *control* in the development and operation of federal reclamation projects.[48]

■ (b) California also attempts to draw analogies to Section 5 of the Auburn-Folsom South Project Act, 43

U.S.C. § 616aaa—§ 616fff. This act generally provides for the construction of the Auburn Dam on the American River and for distribution facilities in downstream areas. The Auburn-Folsom South Project Act imposes specific obligations on federal officials, similar to ·those imposed in the New Melones Acts,[49] including: provision for power generation, 43 U.S.C. § 616aaa; flood control, 43 U.S.C. § 616bbb; recreation, 43 U.S.C. § 616ccc; fish and wildlife enhancement, 43 U.S.C. § 616ccc; protection of the needs of counties and watersheds in which the water originates, 43 U.S.C. § 616eee. Additionally, the Auburn-Folsom South Project Act imposes a further obligation on the Secretary of the Interior to "give due consideration" to California's water plan and to "consult" with local interests affected by the project, 43 U.S.C. § 616ddd.

Specifically, Section 5 of the Auburn-Folsom South Project Act provides as follows:

> "Nothing contained in [this Act] shall be construed by implication or otherwise as an allocation of water, and in the studies for the purposes of developing plans for disposal of water as herein authorized, the Secretary shall make recommendations for the use of water in accord with State water laws, including but not limited to such laws giving priority to the counties and areas of origin for present and future needs."

Section 5 of the Auburn-Folsom Project Act mandates that the Secretary of the Interior shall make recommendations for the use of water in accord with State law *in the studies for the purposes of developing plans for the disposal of water as authorized by the Act.* It does not confer project control on the State of California.[50]

48. It should be noted that the Federal Water Supply Act also specifically provides that the act "shall not be construed to modify the provisions of" Section 8 of the 1902 Act. 43 U.S.C. § 390b(c).

49. See discussion of New Melones Authorizing Acts, *infra.*

50. This reading is entirely consistent with the Congressional history of § 5 of the Auburn-Folsom South Project Act. See S.Rep.No. 1289, 88th Cong., 2d Sess., 3–4 (1964) ; H.R. Rep.No.1826, 88th Cong., 2d Sess., 10 (1964).

(c) It is also pointed out by California that the National Environmental Quality Improvement Act of 1970 (NEQIA) provides that the "primary responsibility for implementing this policy [for protection and enhancement of the national environment] rests with State and local governments." 42 U.S.C. § 4371(b)(2). California further indicates that the National Environmental Policy Act of 1969 (NEPA) states that federal agencies must cooperate with States and local governments in the achievement of environmental goals. 42 U.S.C. § 4331(a).

The Congressional intent underlying both NEQIA and NEPA was to raise awareness of environmental concerns and provide a mechanism for the input of such concerns in the decision-making process. The "mechanism" to be employed is the Environmental Impact Statement. At least in the case of the New Melones Dam project, the Ninth Circuit Court of Appeals has already tested the sufficiency of the Environmental Impact Statement and has determined that environmental concerns were adequately considered. *Environmental Defense Fund, Inc. v. Armstrong,* 487 F.2d 814 (9th Cir. 1973), *cert. denied* 416 U.S. 974, 94 S.Ct. 2002, 40 L.Ed.2d 564 (1974). There is no indication that Congress intended either NEQIA or NEPA to either affirm or establish a policy of state control of the environmental aspects of federal reclamation projects.

(d) The Flood Control Act of 1944, P.L. 78–534, 58 Stat. 887, and the Flood Control Act of 1962, P.L. 87–874, 76 Stat. 1180, 1191, authorize the New Melones Project. California cites sections of these authorizing acts in support of its contention that states may exercise control over the development and operation of federal reclamation projects. California relies particularly on three aspects of these acts:

The 1944 Act declares as follows:

"[I]t is hereby declared to be the policy of the Congress to recognize the interest and rights of the states in determining the development of the water sheds within their borders and likewise their interests and rights in water utilization and control, as herein authorized to preserve and protect to the fullest possible extent established and potential uses, for all purposes, of the waters of the Nation's rivers." 58 Stat. 887–88 (1944).

The 1962 Act imposes specific obligations on federal government officials in operating the project including: giving priority to water needs within the Stanislaus River Basin before water is exported for use outside the basin, providing for the preservation and propagation of fish and wildlife, providing for the generation of electrical energy, and maintaining downstream water quality control. 76 Stat. 1191–92.

The 1962 Act makes specific mention that states are not to control flood control aspects of the project, 76 Stat. 1191, and the 1944 Act specifically prevents state control with respect to water rights reserved for Indian reservations. 58 Stat. 891.

The authorizing act provisions cited by California, however, are entirely consistent with the concept of federal control of federal reclamation projects, coupled with federal-state development and coordination as to water uses. Coordination in the planning stage does not mean federal abdication of responsibility or control to state boards and agencies in the development and operation of federal reclamation projects. Further, the enumeration of specific federal obligations does not infer state control nor does the specific identification of exceptions to state control imply that other elements of project operation are to be placed within state control.

In summary, therefore, although the acts cited by California indicate a strong Congressional intention to include the

States and state law in the planning process and to ensure federal-state cooperation in projects, it cannot be said that these acts indicate by analogy or otherwise, a Congressional intention to abdicate the federal government's responsibility to develop and operate reclamation projects.

(4) Administrative Practice.

Although the Congressional history and judicial interpretation of Section 8 supports the legal posture of the United States, the State of California has urged this court to nevertheless consider the administrative practice of the Bureau of Reclamation vis a vis the state board. Certainly, when construing the meaning of a statute, it is pertinent and appropriate for a court to look to the administrative practice and interpretation placed on the statute by those charged with its administration. *Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). This rule of statuory construction is grounded in the belief that by statutory clarification Congress would presumably have altered any administrative interpretation which conflicts with the statute's intent.

The administrative practice of the Bureau of Reclamation is of some relevance in the present case. Both the United States and California have asserted to this court that this is a case of first impression and of national importance. If indeed this is true, as appears to be the case, then the administrative practice of the Bureau regarding the acquisition of water for federal reclamation projects has been an extraordinarily happy and tranquil practice which has somehow avoided the courts for three-quarters of a century since the enactment of Section 8. Such longstanding harmony would indicate that Congress was apparently satisfied that both the Bureau and the state boards were exercising authority within the allowable scope of Section 8.

The exhibits and affidavits on the subject of administrative practice have been primarily submitted by California. The Secretary of the Interior, the Commissioner of Reclamation, and the Regional Director of the Bureau of Reclamation have all been cited in these exhibits and affidavits. For example, California cites the 1944 statement submitted by the Regional Director of the Bureau, after consultation with the Secretary of the Interior and the Commissioner of Reclamation. This statement was quoted by the Supreme Court in *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 740, 70 S.Ct. 955, 94 L.Ed. 1231 (1950). The statement reads in pertinent part as follows: [51]

"The Bureau of Reclamation does recognize and respect existing water rights which have been initiated and perfected or which are in the state of being perfected under State laws. The Bureau of Reclamation has been required to do so by Section 8 of the Reclamation Act of 1902 ever since the inception of the reclamation program administered by the Bureau of Reclamation. The Bureau of Reclamation has never proposed modification of that requirement of Federal law; and on the contrary, the Bureau of Reclamation and the Secretary of the Interior have consistently through the 42 years since the 1902 Act, been zealous in maintaining compliance with section 8 of the 1902 Act.

They are proud of the historic fact that the reclamation program includes as one of its basic tenets that the irrigation development in the West by the Federal Government under the Federal Reclamation Laws is carried forward in conformity with State water laws. Ample demonstration of the effect of this law and policy of administration, in action, has been given in connection with the Central Valley Project. Water filings made by the State have been obtained by the Bu-

---

51. Defendant's memorandum, p. 21, September 3, 1974.

reau of Reclamation by assignment, and vested water rights have been acquired by the United States, by purchase, the consideration amounting to millions of dollars and being agreeable to the vendors—all in conformity with state law."

In 1948, the Bureau repeated this view. The Bureau's Regional Director, in a letter to Representative Clair Engle of California, quoted from a letter of the Assistant Secretary of the Interior William E. Warne, as follows: [52]

"As you know, the Sacramento Valley water rights are protected by: (1) Reclamation law which recognizes State water law and rights thereunder; (2) the State's counties of origin act, which is recognized by the Bureau in principle; and (3) the fact that Bureau filings on water rights are subject to State approval."

In 1950, Congress received a memorandum from the Commissioner of Reclamation entitled "Administrative Practice in Regard to Federal Appropriation of Water," a copy of which was also submitted to the Supreme Court in the *Gerlach* case. The Commissioner stated in pertinent part as follows: [53]

"It is the practice of the Government to make appropriations of water from unnavigable streams in accordance with the provisions of state law (sec. 8, act of June 17, 1902, 32 Stat. 388). Before taking any steps toward the appropriation of water in any State, either by posting and recording notice of appropriations or filing application for permits to appropriate, full report as to the advisability of making such appropriation shall be submitted . .

It appears from the foregoing that in practice the Department has generally regarded section 8 of the Reclamation Act of 1902 as directory of the course of action to be followed in its assertion of water rights for projects governed by the Federal Reclamation Laws and with respect to the recognition of rights under various State statutes and that it has followed the line marked out by that section regardless of whether the stream is navigable or nonnavigable.

Public statements by officials of the Department of the Interior in recent years with the approval of the Department are in conformity with this practice.

Whatever the correct theory be as to ownership of unappropriated water, the net effect as regards State laws is the same so far as the Bureau of Reclamation and its activities are concerned. This is true because of section 8 of the 1902 act. The Bureau of Reclamation and the Secretary of the Interior are required by that law to proceed in conformity with State water laws; they do so proceed; and they would strenuously oppose any change in the Federal law which now requires them to proceed in conformity with State water laws.

Should the United States, in connection with the development of the Central Valley Project, as now or as it may be in the future authorized, desire to obtain or develop additional water supply for the project, it is and will be the intention and the clear policy of the Bureau of Reclamation and the Secretary of the Interior to obtain or develop the additional water supply by proceeding in conformity with the State law."

In 1952, Secretary of the Interior Oscar L. Chapman, wrote the following words in a letter to California Governor Earl Warren: [54]

---

52. Defendant's memorandum, p. 22, September 3, 1974, quoting from 95 Cong.Rec. A961, 81st Cong., 2d Sess. (1948).

53. Defendant's memorandum, pp. 22–23, September 3, 1974, quoting Hearings on S. 1275 before the Subcommittee on Irrigation &

Reclamation, Senate Comm. on Int. & Ins. Affairs, 88th Cong., 2d Sess., 311, 312, 320, 322, 323 (1964).

54. Defendant's memorandum, pp. 23–24, September 3, 1974, quoting from CVP Documents, Part 1, 810–812 (1956).

"The State of California of course asserts a certain scope of jurisdiction of the water of the State and of its use, and by section 8 of the Reclamation Act of 1902 . . . Congress enjoined the Secretary of the Interior, in carrying out the provisions of the act, to proceed in conformity with the State law. . . . The current estimate of the cost of the construction of the Central Valley Project is $700,000,000.00. The recoupment of the legally reimbursable portion of this Federal expenditure is necessarily dependent on a legal freedom, as well as a legally sanctioned duty, on the part of the United States to operate the project as it has been planned by both the State of California and the United States. This freedom in turn depends on the validity and extent of the rights of the United States to store, divert, and use water under the law of California. These rights have their inception in certain applications by the California Director of Finance to appropriate unappropriated water, which have been or are to be assigned by him to the United States, in certain applications made by the United States itself, and in already vested rights to the use of water which have been acquired by the United States from private parties through a negotiated purchase or inverse condemnation involving the payment of compensation."

The United States has not disputed the making of the statements cited by California, but rather has interpreted both their meaning and their relevancy differently than has California. The United States contends, *inter alia,* that the statements were all made prior to 1952 in a non-adversary proceeding and "are not likely to have the clarity one should look to to find the precise position of litigants,"[55] that the statements were all made prior to a number of very important court decisions which helped to define Section 8, and that in any case, the views expressed in the statements are entirely consistent with the notion that the federal government must comply with the *forms* of state law, but only on the basis of comity.[56]

As to the *actual* practice of the Bureau of Reclamation in California, affidavits have been submitted by California which assert that since 1938, the State Board has received 51 applications from the federal government to acquire water for various elements of the Central Valley Project. California notes that 41 of those applications were *conditionally* approved.[57] The United States does not dispute this, but asserts that it has consistently maintained to the State Board that it was appearing only for reasons of comity.[58]

In analyzing the statements and actions, two points are noteworthy. The Supremacy Clause of the United States Constitution is a limitation upon the states according to which federal law cannot be subordinated to state regulation within the areas of Congress' exclusive legislative powers. *People of the State of California ex rel State Water Resources Control Board v. Environmental Protection Agency,* 511 F.2d 963 (9th Cir. 1975). As noted earlier in this opinion, both parties to this action have admitted that because of the national implications inherent in reclamation, Congress could have afforded all power and control over federal reclamation projects to the federal government, giving no power and control to the states. See *Ivanhoe Irrigation District v. McCracken,* 357 U.S. 275, 294, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958). California's position, however, is that the 1902 Act was a manifestation of Congress' intent to give

---

55. It is apparent, of course, that at least some of the statements were made after 1952.

56. Plaintiff's memorandum, pp. 28–30, October 11, 1974.

57. Defendant's memorandum, p. 24, September 3, 1974.

58. Plaintiff's memorandum, p. 54, October 11, 1974. California does not dispute this assertion. See Defendant's memorandum, pp. 4–5, November 19, 1974.

states certain powers in the operation and control of federal reclamation projects. To accept California's position, however, would require a finding that the 1902 Act waived exclusive federal jurisdiction. Waivers of exclusive federal jurisdiction, like waivers of sovereign immunity, are to be strictly construed. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); *People of the State of California ex rel State Water Resources Control Board v. Environmental Protection Agency*, 511 F.2d 963 (9th Cir. 1975).

Secondly, this court must remain mindful of the admonition of the Ninth Circuit Court of Appeals in *Turner v. Kings River Conservation District,* 360 F.2d 184, 198 (9th Cir. 1966):

".  .  . [R]eason precludes an interpretation of the general provisions of Section 8 of the Reclamation Act [of 1902]  .  .  . which would impute to Congress an intention to frustrate its plans for this project by subjecting it to the risk that it might never be used for some of the authorized purposes, should a state permit not be forthcoming."

Certainly, all the administrative pronouncements and actions cited above are susceptible to either the interpretation advanced by California or the interpretation advanced by the United States. Viewed, however, in the perspective of the Congressional history and judicial decisions relating to Section 8 previously cited in this opinion, this court is constrained to reject the interpretation advanced by California as being inconsistent with the Congressional history and those judicial decisions. On the other hand, all the administrative statements and actions are consistent with the view that the Bureau does and will respect existing state water laws and further, that the Bureau does and will comply with state filing requirements *on the basis of comity.*

## CONTENTIONS IN THE NATURE OF ESTOPPEL

As an alternative argument, California has raised several issues in the nature of estoppel against the United States. This alternative argument is grounded on the proposition that even if federal law precludes state control of federal reclamation projects in general, factors inherent in the instant case would estop the United States from contesting the authority of the State Board to issue Decision 1422. These contentions will be discussed seriatim.

(1) Equitable estoppel.

California contends that the United States should be equitably estopped from denying the authority of the Board, particularly as to Decision 1422, because the United States has consistently submitted to the Board, or its predecessor, applications for permits to appropriate unappropriated water for the Central Valley Project.

California has cited the cases of *United States v. Georgia-Pacific Co.*, 421 F.2d 92 (9th Cir. 1970), *Brandt v. Hickel*, 427 F.2d 53 (9th Cir. 1970), and *Gestuvo v. District Director*, 337 F.Supp. 1093 (Cal. 1971), for the proposition that the United States cannot be estopped in its sovereign capacity, but can be estopped in its proprietary capacity. Such a distinction, however, is not the law in this circuit.

Equitable estoppel may, under certain circumstances, be applied against the United States without regard to its "capacity", whether proprietary or sovereign. *United States v. Lazy FC Ranch*, 481 F.2d 985 (9th Cir. 1973). As the Ninth Circuit Court of Appeals stated in *Lazy FC Ranch:* [59]

"[E]stoppel is available as a defense against the government if the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged by imposition of estoppel.  .  .  . This proposition is true even if the government is acting in a ca-

59.  481 F.2d at 989.

pacity that has traditionally been described as sovereign . . . although we may be more reluctant to estop the government when it is acting in this capacity."

The test of estoppel applied in this circuit was outlined in *Georgia-Pacific* at 421 F.2d at 96: (a) the party to be estopped must know the facts; (b) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (c) the latter must be ignorant of the true facts, and (d) he must rely on the former's conduct to his injury.

■■■ If in fact there is a legitimate disagreement between the United States and California as to the true nature of their relationship regarding the acquisition of water to develop federal reclamation projects, then it can hardly be said that the United States "knew" the true facts and thereby "induced" California to engage in detrimental conduct. Further, this court is doubtful whether the expenditure of time and effort by the State Board in the conduct of hearings can rise to the level of "injury" envisioned by the equitable estoppel doctrine.

(2) *Res judicata* and collateral estoppel.

California Water Code § 1360 provides that any person interested in any application for a permit to appropriate water may within 30 days after final action by the Board file a petition for a writ of mandamus in the Superior Court to inquire into the validity of the Board's action. California Code of Civil Procedure § 1094.5 provides for the mechanism and procedures on review of administrative actions.

At no time did the United States seek a direct appeal of Decision 1422 to the California courts. Rather, the United States initiated the instant declaratory relief action in federal court. This failure to pursue California's mandamus provisions, argues California, makes Decision 1422 *res judicata* and, through the doctrine of collateral estoppel, prevents attack in this court on issues and matters decided by the Board in Decision 1422.

■■■ The doctrines of *res judicata* and collateral estoppel rest upon considerations of economy of judicial time and the public policy favoring the establishment of certainty in legal relations. The doctrine of *res judicata* has a double aspect: (1) it precludes parties or their privies from relitigating a cause of action that has been finally determined by a court of competent jurisdiction; and (2) any issue necessarily decided in such litigation is conclusively determined as to the parties or their privies in a subsequent lawsuit on a different cause of action. The latter aspect of *res judicata's* double nature is more properly called collateral estoppel. *Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948); *Teitelbaum Furs, Inc. v. Dominion Insurance Co., Ltd.*, 58 Cal.2d 601, 604, 25 Cal.Rptr. 559, 375 P.2d 439 (1962).

■■■ Both the *Sunnen* case and the *Teitelbaum* case indicate, however, that a primal and essential element necessary for *res judicata* and collateral estoppel is that the court in the first action be a "court of competent jurisdiction". The rendition of a judgment without jurisdiction is a usurpation of power and makes the judgment void. 46 Am.Jur.2d Judgments § 22 (Bancroft-Whitney 1969). Before a judgment may operate as a conclusive determination of a cause of action, or of the issues litigated therein, it is necessary that it should have been rendered by a court of competent jurisdiction of the parties and of the subject matter or cause of action. 46 Am.Jur. 2d Judgments § 446 (Bancroft-Whitney 1969). In dealing with an assertion of *res judicata* and its progeny collateral estoppel, this court may consider whether the subject matter, the issues and the character of the judgment rendered were of a class within the scope of the powers of the Board. 46 Am.Jur.2d Judgments § 446 (Bancroft-Whitney 1969).

■■■ It is apparent from the previous discussion of Section 8, that the

Board acted *ultra vires* its authority vis a vis the Bureau. In a very real sense the Board has no jurisdiction over the Bureau, but may only, because of comity, be asked to determine the availability of unappropriated water. As to the Bureau, the Board is not a "court of competent jurisdiction", but rather, once a determination has been made that unappropriated water is available, the Board functions in a purely ministerial manner in issuing permits to the Bureau. Where the Board seeks to do more than make the determination of availability of unappropriated water and, as in the instant case, attempts to impose terms and conditions on the granting of a permit to appropriate water for a federal reclamation project, the United States need not pursue California appellate remedies, but rather, could appropriately turn to a federal court in a declaratory relief action for the purpose of interpreting and clarifying federal law.

(3) Effect of Decision 1422.

As a concomitant to its estoppel arguments, California has asked this court to conclude as a matter of law that Decision 1422 does not materially alter or conflict with the purposes of the New Melones Project. This contention is based primarily upon the reasoning that the United States will be allowed to acquire additional water for the project once it is able to show a need for additional water and once it develops a specific plan for the use of such water. California's argument in this regard is that Decision 1422 does not prevent the fulfillment of the project's purposes, but instead merely temporarily denies a part of the water sought by the Untied States until it can show a specific and identifiable need for the water.

The United States has strenuously argued that the conditions and terms sought to be imposed by Decision 1422 do in fact alter or conflict with the purposes of the New Melones Project.

It appears to this court, however, that the question of the effect of Decision 1422 on the purposes of the New Melones Project is simply not material to the disposition of this case. As this opinion has previously noted, the "jurisdiction" of the Board in regard to the construction and operation of federal reclamation projects—once those projects have been approved—extends only so far as the determination of the availability of unappropriated water. Beyond that point, the Board has no jurisdiction. Therefore, *any* conditions or terms imposed by the Board must be considered *ultra vires* and "in conflict" with the purposes of the federal reclamation project.

(4) Public Policy.

Finally, California contends that if the United States prevails in its position, California will have no voice whatsoever in the use of its waters stored at federal reclamation projects, and this would be against the public interest of the people of California.

This contention ignores several basic facts. As an initial matter, California itself authorized the Central Valley Project through the Central Valley Project Act of 1933, Cal.Stats. Ch. 1042. Thereafter, California actively solicited federal monies and support for the development of the CVP and the New Melones Project. As recently as last year, the California electorate voted in favor of continued development of the New Melones Project.[60] California has not contended that its input was not sought or that its law was not consulted in the planning process of the New Melones Project.

When speaking of the public interest of the people of California, it is useful to keep this case in perspective. This court does not view this case as a confrontation between environmentalists and conservationists on the one hand versus industrial, agricultural and municipal

---

60. During the 1974 California Primary, California voters rejected Proposition 17, the so-called "Deliver the River" Proposition which would have required the State of California to seek stoppage of the New Melones Project.

water users on the other. The primal question before this court is one of state versus federal power as to the operation and control of federal reclamation projects. It is the sort of case which inevitably arises in the multiple sovereignty of a federal system of government. As such, this court must consider not only the public interest of the people of California as Californians, but also as citizens of the United States.

## APPROPRIATENESS OF SUMMARY PROCEEDINGS

California's motions for judgment on the pleadings and for summary judgment are grounded on the premise that the case involves interpretations of federal law and therefore the issues in the case are legal, rather than factual. The question presented by a motion for judgment on the pleadings pursuant to F.R.C.P. 12 is solely one of law and, if an issue of fact is raised by the pleadings, the motion must be denied. Summary judgment, pursuant to F.R.C.P. 56, is only appropriate where there are no material facts in dispute and a party is entitled to judgment as a matter of law.

From the face of the complaint itself, issues of fact are raised [61] and thus in a technical sense, judgment on the pleadings is inappropriate.

Notwithstanding that issues of fact are raised on the face of the complaint, this court agrees with California that no *material* fact is in dispute. This court further agrees with California that this case involves legal questions concerning which judgment can be granted as a matter of law. Accordingly, summary judgment is appropriate. However, as this opinion has indicated, judgment is appropriate for the United States, a non-moving party. The question thus arises: Can summary judgment be granted in favor of a non-moving party?

It would seem that where, as in the instant case, both parties have been afforded a full and fair opportunity to present their case, and where summary judgment is appropriate, a court should grant summary judgment to a non-moving party without the formality of a cross-motion for summary judgment.[62] See *Hennessey v. Federal Security Administrator*, 88 F.Supp. 664 (Conn. 1949); *Local 453 v. Otis Elevator Company*, 314 F.2d 25 (2d Cir. 1963).

There is no doubt that summary judgment is applicable to a proceeding for declaratory relief. 6 Moore's Federal Practice § 56.17 [19] (1974). Accordingly:

Declaratory judgment is entered as follows:

(1) The United States can appropriate unappropriated water necessary for use in any federal reclamation project within the State of California, but must first, in accordance with comity, apply to the California State Water Resources Control Board for a determination by that Board of the availability of unappropriated water;

(2) When the United States submits applications to the California State Water Resources Control Board, that Board must grant such applications if unappropriated waters are available;

(3) Nothing contained in Section 8 of the 1902 Act or in any other presently existing federal law, regulation or administrative directive allows the California State Water Resources Control Board to impose any terms or conditions in permits issued to the United States as a result of applications to the Board by the United States for allocations of unappropriated water;

(4) Decision 1422 is void in all respects where it attempts to impose terms and conditions of any kind upon the ac-

---

61. For example, the complaint asks this court to find that the conditions and terms imposed by Decision 1422 conflict with the construction and operation of the New Melones Project.

62. It should be noted that California has consistently admitted in its pleadings and in open court that should this court find against it as a matter of law, then summary judgment would be appropriate for the non-moving party, the United States.

quisition by the federal government of unappropriated waters as said terms and conditions may relate to the control, development or operation by the federal government of the New Melones Project.

California's motion for summary judgment is denied and summary judgment is granted for the United States in accordance with the views expressed in this opinion.

It is so ordered.